**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael Christopher OSBORN, Defendant–Appellant.**

No. 99–10119.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 11, 2000.

Decided Feb. 9, 2000.

Paul G. Turner, Assistant Federal Public Defender, Las Vegas, Nevada, for the defendant-appellant.

Robert A. Bork, Assistant United States Attorney, Las Vegas, Nevada, for the plaintiff-appellee.

1. Honorable Ellsworth A. Van Graafeiland, Senior United States Circuit Judge, for the

Before: VAN GRAAFEILAND,[1] ALARCON, and SILVERMAN, Circuit Judges.

ALARCON, Circuit Judge:

Michael Christopher Osborn ("Osborn") appeals from the denial of his motion to suppress the evidence seized from his person following his arrest for failing, as a convicted person, to notify the police within 48 hours of his change of address. Osborn contends that the arresting officers did not have reasonable cause to detain him prior to questioning him about his prior contacts with the Las Vegas Metropolitan Police Department. We affirm because we conclude that, based on the totality of the circumstances known to the officers, they had reasonable cause to detain Osborn and to question him briefly about his identity, his correct address, and his prior contacts with the Las Vegas Metropolitan Police Department.

I

On January 12, 1998, at approximately 4:45 p.m. Irene Pagtulingan informed her son Joey Pagtulingan, that she had found some small baggies and a scale in his room. Based on this discovery, Mrs. Pagtulingan suspected that her son or his friends were involved with narcotics.

Mrs. Pagtulingan told her son that his friends could not visit him in her residence without her permission. Joey Pagtulingan became enraged and struck his mother on her left shoulder. Adam Hernandez, Mrs. Pagtulingan's fiance, who was present during this confrontation, came to her defense. Joey Pagtulingan then stated: "You don't know who you are messing with. If I don't kill you, I have friends

Second Circuit, sitting by designation.

who can." Following this threat, Joey Pagtulingan fled from his mother's apartment. Mrs. Pagtulingan and Mr. Hernandez were frightened by the assault and death threat. They reported the death threat to the Las Vegas Metropolitan Police Department.

At approximately 6:15 p.m. on the same date, Officer Richard Lanave and Officer Mike Loving of the Las Vegas Metropolitan Police Department arrived at Mrs. Pagtulingan's apartment to investigate the assault and death threat. They were armed and in uniform. Mrs. Pagtulingan and Mr. Hernandez told the officers that Mrs. Pagtulingan had been assaulted by her son and that he had threatened to kill them. After receiving this crime report, the officers heard a knock on the door. Officer Lanave went to the door because he believed that the person at the door "could possibly be Joey coming back to the house." Mrs. Pagtulingan informed the officer, however, that the person at the front door was one of her son's friends. She told the officers that this person at the front door had previously visited Joey Pagtulingan in her apartment.

Officer Lanave opened the front door. Osborn asked the officer if Joey Pagtulingan was home. Officer Lanave stated: "No Joey's not here. Have you seen him?" Osborn replied that he had seen Joey Pagtulingan earlier that day.

Osborn appeared very nervous when he saw the officers in the apartment. Officer Lanave testified that his response to Osborn's question concerning whether Joey Pagtulingan was home should have "deflected" Osborn's concern that he was under investigation, "but it didn't seem to appear to lessen his nervousness." Officer Lanave decided to inquire concerning Osborn's identity because of his nervous demeanor.

Mrs. Pagtulingan's residence was on the second floor of a two-story apartment building. An outside staircase provided access to her apartment from the front parking lot. At the top of the staircase was a 10 by 5 foot landing.

The officers stepped outside the apartment to question Osborn away from Mrs. Pagtulingan and Mr. Hernandez. The officers wanted to talk to Osborn because they "figured that he might be part of our investigation."

Officer Lanave positioned himself about three feet in front of Osborn. Officer Loving stood about three feet behind Osborn. Officer Lanave testified that he and Officer Loving took a "cover/contact" position because they were concerned about their safety based on the report they received from Mrs. Pagtulingan about Joey's friends "being potentially violent." Neither officer blocked Osborn's access to the staircase.

Officer Lanave asked Osborn when he had last seen Joey Pagtulingan. Osborn replied that he had seen him earlier that day and expected him to be home. Officer Lanave then asked Osborn to state his name. Osborn replied that his name was "Michael Osborn." Officer Lanave next asked Osborn if he had any identification. Osborn handed the officer his Nevada driver's license. Officer Lanave also asked Osborn if he had had any previous contacts with the Las Vegas Metropolitan Police Department. Osborn replied that he had been arrested for burglary and handed Officer Lanave a Las Vegas Metropolitan Police Department Convicted Person Registration card which reflected that Michael C. Osborn had been convicted of a felony. Officer Lanave testified that this type of inquiry is common police procedure when an officer makes contact with someone in order "to know who we're dealing with."

Officer Lanave radioed the police department to determine whether Osborn had any outstanding warrants or previous arrests. While waiting for a response from official police channels, Officer Lanave asked Osborn when he had been arrested. Osborn stated he was arrested the year before for the crime of burglary.

Officer Lanave asked for his address. Osborn replied that it was 244 East Harmon. Officer Lanave asked Osborn if that

was his current address. After hesitating briefly, Osborn replied that it was not his current address.

The officers then placed Osborn under arrest for failing to inform the Las Vegas Metropolitan Police Department of his change of address within 48 hours in violation of Nev.Rev.Stat. 179 C.110. The officers did not return Osborn's driver's license or his Convicted Person Registration card to him until after he was arrested. The entire conversation with Osborn lasted three to five minutes.

Osborn was searched as an incident to his arrest. The search revealed that Osborn had a 762 Norinco pistol in his right front pants pocket. His backpack contained 30 rounds of ammunition, a four inch folding knife, and a spring loaded blackjack-type sap, a scale, and some baggies.

On February 25, 1998, Osborn was indicted for being a convicted felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(1)(2). He entered a plea of not guilty on March 27, 1998. On May 7, 1998, Osborn filed a motion to suppress all of the physical evidence seized as an incident to his arrest.

An evidentiary hearing was conducted on the motion to suppress before a United States magistrate judge on June 11, 1998. In his initial order, the magistrate judge recommended that the motion to suppress be denied because "the encounter between Officer Lanave and Osborn was a voluntary conversation and did not amount to a seizure until Officer Lanave advised Osborn that he was under arrest." After reviewing the record of the evidentiary hearing conducted before the magistrate judge, the district court concluded that Officer Lanave's questioning "constituted a seizure of Defendant's person." The district court rejected the magistrate judge's recommendation and ordered him to determine "whether reasonable suspicion existed to question the defendant further after his identity was determined."

In response to the district court's order, the magistrate judge submitted a supplemental report and recommendation in which he concluded that Officer Lanave articulated sufficient facts to demonstrate that reasonable suspicion existed "to make the inquiries for the protection of Mrs. Pagtulingan and Mr. Hernandez." The district court adopted the magistrate judge's supplemental report and recommendation. The district court denied the motion to suppress holding that "[i]n light of the information that Defendant was a friend of Joey's, and Joey had just told his mother's friend that he (Joey) had friends who would kill him, the officers were justified in questioning Defendant about his prior involvement with the law." The court also held that the information concerning Osborn's failure to notify the Las Vegas Metropolitan Police Department of his change of address would have been inevitably discovered by the police dispatcher once Osborn's name and registration number had been checked.

On October 19, 1998, Osborn changed his plea to the crime of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Osborn's plea was entered subject to his right to appeal from the denial of his motion to suppress the physical evidence recovered in the search following his arrest. Osborn filed a timely notice of appeal from the judgment of conviction. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## II

Osborn contends that the officers violated his rights under the Fourth Amendment because they lacked reasonable suspicion to seize his person, to question him concerning his identity, his correct address, and his prior contacts with the Las Vegas Metropolitan Police Department as part of their investigation of Joey Pagtulingan's threat that he or his friends would kill Mrs. Pagtulingan and her fiance. He argues that the mere fact that Osborn was an associate of Joey Pagtulingan did not establish the requisite reasonable suspicion that would justify the seizure of his

person to make these inquiries. We review the denial of a motion to suppress de novo. *United States v. Kemmish,* 120 F.3d 937, 939 (9th Cir.1997), *cert. denied,* 522 U.S. 1132, 118 S.Ct. 1087, 140 L.Ed.2d 144 (1998). A district court's factual findings are reviewed for clear error. We reviewed de novo a finding that reasonable suspicion existed to justify the seizure of a person. *United States v. Hall,* 974 F.2d 1201, 1204 (9th Cir.1992).

Osborn did not present any evidence at the suppression hearing. Osborn did not testify that his responses to the officers were not voluntary, or that he believed he was not free to leave the vicinity. Officer Lanave's testimony is undisputed. Accordingly, our task is to determine whether Officer Lanave's objective observations and the logical inferences that can be drawn from the totality of the circumstances known to him justified the brief detention of Osborn for questions relating to his identity, his correct address, and his prior contacts with law enforcement.

The Fourth Amendment protects individuals from unreasonable seizures of their persons. U.S.C.A. Const. Amend. IV.
> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any questions put to him; indeed he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective ground for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.

*Florida v. Royer,* 460 U.S. 491, 497–498, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (citations omitted).

There is no dispute that Officer Lanave questioned Osborn in a public place—an outdoor staircase that leads to a parking lot. The initial questions posed to Osborn related to his identity and a request for identification. The Supreme Court instructed in *INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) that: "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *Id.* at 216, 104 S.Ct. 1758.

The district court rejected the finding of the magistrate judge that Osborn's responses were voluntary, and that he was not seized or detained during Officer's Lanave's questioning regarding Osborn's identity, his present address, and whether he had had prior contact with the Las Vegas Metropolitan Police Department. The district court held that Osborn's statements were not voluntary. It stated that in *United States v. Chan–Jimenez,* 125 F.3d 1324 (9th Cir.1997), this court "definitively ruled that when a law enforcement official retains control of a person's identification papers, and initiates further inquiry while retaining the needed papers, a reasonable person would not feel free to depart." In *Chan–Jimenez,* in setting forth all the circumstances surrounding the encounter, we noted that:
> Officer Price kept his hand on his revolver—possibly a desirable safety measure, but one that also let Chan–Jimenez know that there could be adverse consequences for any failure to submit to authority. A reasonable person in Chan–Jimenez's position would not have felt free to ignore the officer's presence and go about his business.

*Id.* at 1326. No such menacing show of force was made by the officers in this matter. We need not decide, however, whether the district court was correct in holding that the mere fact that the officers

held onto Osborn's identity papers during the brief interrogation is sufficient to demonstrate that he was detained or seized because the Government has not challenged the district court's finding that Osborn was not free to leave.

### III

 Osborn maintains that Officer Lanave failed to articulate particularized and objective facts demonstrating a reasonable suspicion that Osborn was engaged in criminal activity. He further argues that:

[t]he fact that some unidentified member of the broad general class of Joey Pagtulingan's friends might well have the will and capacity to kill or injure Mrs. Pagtulingan and her fiance adds nothing to the required "individualized suspicion" finding necessary to seize Mr, Osborn, question him about his criminal history, and ultimately search him incident to an arrest.

In *Florida v. Royer*, the Supreme Court held that "a reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the stop." *Id.* at 498, 103 S.Ct. 1319. In the instant matter, the officers were informed that Joey Pagtulingan had fled his mother's home after assaulting her and stating that if he didn't kill her and her fiance "he knew people who could." Officer Lanave had also received information from Mrs. Pagtulingan that her son had narcotics paraphernalia in his room—i.e., baggies and a scale—and that he or his friends might be involved in the illegal use or distribution of controlled substance. While interviewing Mrs. Pagtulingan and Mr. Hernandez, Mrs. Pagtulingan identified Osborn as a friend of her son who had visited him at their residence. In light of the virtually contemporaneous threat by Joey Pagtulingan that he would *recruit* someone to kill his mother and her fiance, the officers had a duty to determine whether Joey Pagtulingan's friend had been recruited to harm the residents.

In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972) the Supreme court interpreted *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) as follows:

In *Terry* this Court recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response.

A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Id.* at 145–147, 92 S.Ct. 1921 (citations omitted).

 In determining whether reasonable suspicion existed to justify a brief detention to determine an individual's identity, and to maintain the status quo while verifying or dispelling their suspicion that criminal activity was occurring or contemplated, the court must consider "the totality of the circumstances—the whole picture...." *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). "The whole picture must yield a particularized suspicion ... that the particular individual being stopped is engaged in wrongdoing." *Id.* at 418, 101 S.Ct. 690.

Here the officers were confronted with the following facts:

One. Mrs. Pagtulingan had discovered narcotics paraphernalia that indicated to her that her son and his friends were probably engaged in the possession or distribution of controlled substances.

Two. Joey Pagtulingan assaulted his mother after she informed him of her discovery and ordered him not to invite

friends into her residence without her prior approval.

Three. Joey Pagtulingan threatened to kill his mother and her fiance or to enlist someone to do so.

Four. Joey Pagtulingan fled from his mother's residence after making the threat.

Five. Osborn came to Mrs. Pagtulingan's residence not long after the threat.

Six. Mrs. Pagtulingan recognized Osborn as a friend of her son.

Seven. Osborn appeared nervous throughout the brief questioning regarding his identity, his correct address, and his prior contacts with the Las Vegas Metropolitan Police. We are persuaded that from the totality of these circumstances that Officer Lanave articulated facts justifying the temporary detention of Osborn.

None of the cases cited by Osborn in support of his contention that the officers did not have a reasonable cause to justify a brief detention to seek his identity and to maintain the status quo while they determined if his mission was to harm the occupants of Mrs. Pagtulingan's residence presents analogous circumstances. Osborn was not stopped and frisked as he drove down the street or walked about in a public place in a normal and lawful manner. Instead, Osborn came to Mrs. Pagtulingan's residence while police officers were receiving a report that her son had threatened earlier that afternoon that he or one of his friends would kill her and her fiance.

In *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the Supreme Court concluded that a police officer did not have reasonable suspicion to search Sibron for weapons based solely on an officer's observation that Sibron spoke to a number of narcotics addicts. The officer had no other information that connected Sibron with criminal activity. *Ybarra,* at 95, 100 S.Ct. 338.

In *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), the Supreme Court held that the fact that the police had probable cause to believe that a bartender sold drugs at a tavern did not justify the patting down of the bar's patrons, in the absence of reasonable suspicion that they were armed and presently dangerous. *Id.* at 91–94, 100 S.Ct. 338. Unlike the petitioners in *Sibron* and *Ybarra,* Osborn was not frisked or searched until after he was arrested for failing to notify the Las Vegas Metropolitan Police Department within 48 hours that he had changed his address.

Osborn relies on our decision in *United States v. Rodriguez–Sanchez,* 23 F.3d 1488 (9th Cir.1994) for the proposition that reasonable suspicion cannot be based "on broad profiles which cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *Id.* at 1492 citing *United States v. Rodriguez,* 976 F.2d 592, 596 (9th Cir.1992). *United States v. Rodriguez,* was a driving-while-Hispanic case in which we held that reasonable suspicion could not be premised on a profile that could "certainly fit hundreds of thousands of law abiding daily users of the highways of Southern California." *Id.* at 596. The officers in this case did not seek out Osborn after receiving the crime report as part of a search for all of Joey Pagtulingan's friends. Instead, Osborn sought admittance to Mrs. Pagtulingan's residence while the police were receiving a report that Joey Pagtulingan had fled after threatening to kill his mother and her fiance. Thus, Osborn was not detained simply because he fit a profile that would fit a large number of law abiding citizens. The failure of the officers to briefly question and detain Osborn under the "whole picture" presented by the totality of the circumstances would have violated their duty to protect individuals threatened with harm.

## IV

Because we conclude that Officer Lanave articulated sufficient facts to justify a brief detention of Osborn in order to ask

him questions concerning his identity, his correct address, and his prior contacts with the Las Vegas Metropolitan Police, we do not reach the question whether the information received by the officers concerning his current address and his status as a convicted person under Nevada law would have been inevitably discovered because the detention was lawful, the evidence seized from Osborn following his arrest was not tainted by any illegality. The district court did not err in denying the motion to suppress.

AFFIRMED.