UNITED STATES of America, Plaintiff–Appellee,

v.

Daryl John CHRISTIAN, Defendant–Appellant.

No. 02–30185.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 2003.

Filed Jan. 28, 2004.

Suzanne Lee Elliot, Seattle, WA, argued for the defendant-appellant.

Bruce F. Miyake, Assistant United States Attorney, Seattle, WA, argued for the plaintiff-appellee. John McKay, United States Attorney, Seattle, WA, joined him on the briefs.

Before: D.W. NELSON, KOZINSKI and McKEOWN, Circuit Judges.

KOZINSKI, Circuit Judge:

When, during the course of an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), may police demand to know a suspect's true identity?

### Facts

Responding to a complaint that a man was brandishing a firearm in an apartment building, Seattle police officers met with the complainant, Quillan Small (age 15), and her mother, Karen Kosner. Small was hysterical. Once she calmed down, she told the officers that her mother's boyfriend—a man she called Mr. James— had waved a gun at her during an argument. Kosner was reluctant to corroborate the story and offered very little information. A few minutes later, the officers received word by radio from other responding officers that the suspect (now known to be defendant Daryl John Christian) was in the building.

Upon locating Christian, the officers advised him that they were investigating a complaint involving a gun and asked him for identification. He said that he had no identification on him, but volunteered the name Rick James and the birth date of November 23, 1951. He also said that he lived in the building, a few floors above Kosner and Small. After confirming with Kosner that her boyfriend's name was Rick James, the officers called the Seattle Police Department to confirm the existence of valid identification under that name, and to check for outstanding warrants. The officers also conducted a patdown for weapons and discovered none.

The records check came up with no one by the name Rick James with that birthday. Christian then told the officers that

his identification was from Florida, not Washington. While they ran a Florida check, the officers continued to question Christian about the gun. Christian was evasive and stressed that he did not have a gun "on [his] person." According to the officers, Christian became increasingly nervous and repeatedly put his hands in his pockets, despite at least three admonitions from the officers that he not do so. Worried for their safety, the officers handcuffed Christian. The officers then learned there was no record of a Rick James in Florida. Christian continued to claim that he was Rick James and insisted that he had a Florida driver's license. Their suspicions aroused, the officers informed Christian that he was required to provide a correct name and date of birth, and that if he persisted in lying about his identity, he would face charges of false reporting. Christian responded that his identification was in his car. At the suppression hearing, Christian testified that he told the officers he did not want to go to his car to retrieve his identification, but the officers insisted he do so; the district court, however, found that Christian volunteered to take them to his car.

Christian said that his identification was in the glove box, and acquiesced to the officers' request for permission to open it and look inside. The officers found nothing there. Christian then directed them to a leather bag in the back seat, which contained two wallets. Inside one wallet was a Florida driver's license with Christian's picture and the name Richard Allen James. According to the officers, the license was "a very poor facsimile" and listed James as 6'4", which did not match Christian's height. The second wallet contained another Florida driver's license with Christian's picture—this time with the name Kent Merlin Younger. The officers also found several credit cards, bearing three different names. Based on this evidence, the officers read Christian his *Mi-*

*randa* rights and placed him under arrest. The officers again demanded Christian's true name. Christian directed them to yet another wallet in the pocket of the driver's side door, containing a Washington identification for Albert Ernest Hort, which also had Christian's picture on it. It was only after Christian had been taken to the precinct and fingerprinted that he finally offered his real name. He also told the officers that he'd stashed the gun he had allegedly brandished at Small on the twenty-fourth floor of his apartment building, and signed a written consent for a search of his apartment and car.

Christian moved to suppress all the evidence seized at the time of his arrest. After an evidentiary hearing, the district court declined Christian's motion. Christian pleaded guilty to one count of possessing document-making equipment, in violation of 18 U.S.C. § 1028(a)(5); two counts of identification fraud, in violation of 18 U.S.C. § 1028(a)(7); and one count of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g). Christian reserved the right to appeal the district court's denial of his motion to suppress and now argues that the officers' demand for identification exceeded the proper scope of an investigatory stop. He also claims the consent to search his car was involuntary.

### Analysis

The detention of a suspect under *Terry* is evaluated against a standard of reasonableness under the totality of the circumstances. *Terry*, 392 U.S. at 19, 88 S.Ct. 1868; *see also United States v. Sharpe*, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) ("Much as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria."). To determine whether the stop

was reasonable, we must consider "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20, 88 S.Ct. 1868. Because the officers were responding to an allegation that Christian was brandishing a weapon, the initial contact with Christian was justified. We decide whether the officers' repeated demands for Christian's identification were "reasonably related in scope to the circumstances."

1. Christian asserts that, under *Lawson v. Kolender*, 658 F.2d 1362 (9th Cir. 1981), *Martinelli v. City of Beaumont*, 820 F.2d 1491 (9th Cir.1987), and *Carey v. Nevada Gaming Control Board*, 279 F.3d 873 (9th Cir.2002), it is never reasonable for officers to demand identification during a *Terry* stop. These cases do not support Christian's claim. In each, we held that laws requiring persons to provide reliable identification to the police, or face arrest, violate the Fourth Amendment. We reasoned that "the statutes bootstrap the authority to arrest on less than probable cause." *Lawson*, 658 F.2d at 1366.

■ While failure to identify oneself cannot, on its own, justify an arrest, nothing in our case law prohibits officers from asking for, or even demanding, a suspect's identification. Instead, our cases, as well as those of the Supreme Court, suggest that determining a suspect's identity is an important aspect of police authority under *Terry*. *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981), for example, noted that one of the "most common" investigative techniques used in *Terry* stops is "interrogation, which may include both *a request for identification* and inquiry concerning the suspicious conduct of the person detained." *Id.* at 700 n. 12, 101 S.Ct. 2587 (citation omitted) (emphasis added). *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612

(1972), noted that "[a] brief stop of a suspicious individual, in order *to determine his identity* or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.* at 146, 92 S.Ct. 1921 (emphasis added).

We have held that "interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." *United States v. Osborn*, 203 F.3d 1176, 1180 (9th Cir.2000) (quoting *INS v. Delgado*, 466 U.S. 210, 216, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984)). In *Osborn*, we upheld a *Terry* stop where officers briefly detained an individual as part of a drug investigation, and arrested him because he had failed to inform the police department within forty-eight hours of changing his address, as previously convicted persons were required to do under Nevada law. Because the officer had reasonable suspicion of criminal activity, we held that his request for identification, questions about the suspect's prior contacts with law enforcement, and a check for outstanding warrants or previous arrests, were all within the scope of the officer's authority. *See id.* at 1179, 1182; *see also United States v. Head*, 783 F.2d 1422, 1426 (9th Cir.1986) (holding that it was proper for officers to request identification from defendant because it allowed the officers to "identify their suspect").

These cases go to the heart of *Terry*, which recognized that police officers must be able to "deal[ ] with the rapidly unfolding and often dangerous situations on city streets" through "an escalating set of flexible responses, graduated in relation to the amount of information they possess." *Terry*, 392 U.S. at 10, 88 S.Ct. 1868. To preclude police from ascertaining the identity of their suspects would often prevent officers from fully investigating possible

criminal behavior. Narrowly circumscribing an officer's ability to persist until he obtains the identification of a suspect might deprive him of the ability to relocate the suspect in the future. In other words, if he lacked probable cause to arrest a suspect on the spot, the officer would have to "simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams,* 407 U.S. at 145, 92 S.Ct. 1921. To require this all-or-nothing response would undermine *Terry*'s goal of allowing police "to adopt an intermediate response." *Id.*

Learning a suspect's identity also drives *Terry*'s other important policy—protecting the officer from harm. On learning a suspect's true name, the officer can run a background check to determine whether a suspect has an outstanding arrest warrant, or a history of violent crime. This information could be as important to an officer's safety as knowing that the suspect is carrying a weapon.

■ Finally, our case does not raise the same concerns as *Lawson, Martinelli* and *Carey.* Christian was not arrested for failure to identify himself, or even for offering evasive answers regarding his identity. Christian told the officers he was Rick James. When nothing turned up in any database matching Christian to that name, the officers had cause to suspect that he was using a false identity and might therefore be in possession of false identification. It was only then that the officers demanded Christian's true identity. Moreover, Christian was arrested only after providing fraudulent identification to police officers—a federal crime. *See* 18 U.S.C. § 1028(a)(2) (criminalizing anyone who "knowingly transfers an identification document ... or a false identification document knowing that such document was stolen or produced without lawful authority"). Thus, the officers here did not "bootstrap the authority to arrest on less than probable cause." *Lawson,* 658 F.2d at 1366. They first detained Christian based on reasonable suspicion of gun brandishing and arrested him only after they had probable cause to believe that he had violated the law by presenting two driver's licenses bearing the same photograph but different names. We therefore hold that *Lawson, Martinelli* and *Carey* do not preclude police from demanding a suspect's identification during a *Terry* stop so long as the request is reasonably related to the detention.

■ 2. Having determined that requests for identification made during a *Terry* stop are not inherently unreasonable, we next consider whether the officers' demands for Christian's identification were reasonable in this case.

When the officers first stopped Christian, it was certainly reasonable to ask him to identify himself. The officers had information that a man named Rick James had been brandishing a gun in the building, and the record suggests that they had little more to go on than a name. Had they been unable to ask Christian to identify himself at this point, they would not even have known whether they had stopped the right man. Christian first identified himself as James. When a routine records check of the data system turned up no evidence of a Rick James born on the date Christian provided, he next claimed he had a state identification card from Florida under the same name. In response to the officers' questions, he claimed the identification card had been issued by the state of Florida, but could not remember where in Florida he had supposedly lived. He also claimed he had the actual identification card in his car. The officers testified that Christian became nervous and fidgety, arousing their suspicions that he was lying about his identity. At this point, the police officers could have reasonably believed Christian

**1108**

was in possession of fraudulent identification and were thus acting well within their authority under *Terry*.

That this was unrelated to the brandishing charge that initially prompted the stop is of no consequence here. In *United States v. Torres–Sanchez*, 83 F.3d 1123 (9th Cir.1996), defendants were the subjects of a traffic stop but, once the officer observed their nervous behavior and listened to their inconsistent stories, he pursued a line of questioning unrelated to the original stop. We held that this was reasonable because defendants "failed to dispel ... suspicions about illegal activity and actually created new ones." *Id.* at 1128; *see also Head*, 783 F.2d at 1425 (officers can continue to detain defendant during an investigatory stop when their suspicions are heightened in order to confirm or dispel these suspicions). As with the defendants in *Torres–Sanchez*, the officers' suspicions that Christian had brandished a gun were not dispelled during the stop, and new suspicions were aroused about his identity. Under these conditions of heightened suspicion, it was reasonable for the officers to continue pressing Christian for proof of his true identity.

■ 3. Christian finally claims that, even if the police did not exceed their authority under *Terry*, his consent to search his car was nonetheless involuntary. The district court found "no indication that [Christian's] consent to search his vehicle was coerced or otherwise involuntary," and that he led the officers to his vehicle and gave them false identification. Though Christian offered contrary testimony, the district court was entitled to believe the officers.

**AFFIRMED.**