In the

# United States Court of Appeals

## For the Seventh Circuit

No. 19-1347

JOHN HALL, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHICAGO,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CV 6834 — **Harry D. Leinenweber**, *Judge*.

ARGUED DECEMBER 12, 2019 — DECIDED MARCH 23, 2020

Before BAUER, EASTERBROOK, and ST. EVE, *Circuit Judges*.

ST. EVE, *Circuit Judge*. Plaintiffs in this case ask us to address the proper scope of a *Terry* stop. Police officers stopped Plaintiffs numerous times for violating a City ordinance while they were panhandling on the streets of Chicago. During the course of these street stops, the officers typically asked Plaintiffs to produce identification ("ID"). The officers then proceeded to use the provided ID cards to search for any outstanding warrants for their arrest or investigative alerts—a

process we will call a "warrant check" or a "name check." Plaintiffs contend the officers would not return their IDs to them until after completing the name checks.

Plaintiffs brought an action under 42 U.S.C. § 1983 against the City of Chicago, claiming that name checks unnecessarily prolong street stops and that the delays constitute unreasonable detentions in violation of the Fourth Amendment. They also assert that the City maintained an unconstitutional policy or practice of performing these name checks pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978). Plaintiffs' *Monell* claim arises under several possible theories: that the Chicago Police Department ("CPD") Special Order regulating name checks omitted essential constitutional limits, that CPD failed to train on these same constitutional limits, and that former Superintendent Garry McCarthy promulgated an unconstitutional policy by promoting name checks in conjunction with every street stop.

We conclude that officers may execute a name check on an individual incidental to a proper stop under *Terry v. Ohio*, 392 U.S. 1, 16 (1968), as long as the resulting delay is reasonable. Plaintiffs have failed to establish that they suffered an underlying constitutional violation such that the City can be held liable under *Monell*. We therefore affirm.

## I. Background

For many years, CPD used "contact cards" to document *Terry* stops and other interactions between police and citizens. Each contact card details personal information about the stopped individual, including his or her physical description, address, social security number, driver's license number, and employer information. Between January 2010 and January

2016, CPD documented over 3.3 million street encounters with citizens using contact cards and their successor form—Investigatory Stop Reports.

Roughly two-thirds of these contact cards, by Plaintiffs' estimation, include a notation like "name check clear," "NCC," or "N.C. Clear"—indicating that officers completed a name check during the stop. When on the street, officers perform a name check in one of two ways: (1) radioing a dispatcher at the Office of Emergency Management and Communications ("OEMC"); or (2) entering search criteria into a Portable Data Terminal ("PDT") located in the officer's vehicle. When an officer conducts a name check via a radio call, the officer reads to the dispatcher the individual's information. The dispatcher records that information and performs the inquiry on the officer's behalf through his own terminal at OEMC. The amount of time it takes to obtain the results of a name check from an OEMC dispatcher can vary if, for example, the dispatcher must first respond to higher priority radio traffic. To perform a name check from a police car, the officer types the individual's first and last name into a name inquiry screen on the PDT. When an officer searches in this manner, the results come back seconds later.

In their deposition testimony, several officers testified that they generally would conduct a name check during an investigatory stop, and that it was up to their discretion whether to do so. They testified that they typically asked for citizens' identification cards during street encounters and that people usually waited for the officers to return their ID cards before leaving. They also attested that preventing the subject of a stop from running away motivated their practice of holding onto the ID. Officer Carol Burns, for example, explained that

she would "typically hold onto the person's ID until after [she had] received the call back that the person is clear" to "make sure that they don't walk or run away." Officer Burns also stated that, when conducting a name check, she would "say something like, I'm just going to run your name; if it's clear, you're free to go."

Until November 2018, Chicago's Aggressive Panhandling Ordinance—City Ordinance 8-4-025, MCC § 8-4-025—prohibited certain behaviors while panhandling. The ordinance made it unlawful for a panhandler to solicit a person at specified locations, such as within ten feet of a bus stop, on a public bus, in a restaurant, in a gas station, or within ten feet of an automatic teller machine. The ordinance also prohibited touching a solicited person without his consent, blocking the path of a person entering a building or vehicle, following a solicited person, or panhandling in a group of two or more persons.

Plaintiffs—John Hall, Bonita Franks, Kim Pindak, George Gardner, McArthur Hubbard, and Vernon Dennis—are residents of the City of Chicago who have each panhandled in the City. CPD officers stopped Plaintiffs numerous times and documented those stops with contact cards. From 2005 to 2015, Chicago police records show 65 contact cards for Gardner; 7 for Franks; 39 for Pindak; 33 for Dennis; 54 for Hubbard; and 53 for Hall. These contact cards reflect that, in many of the stops, the officers performed name checks. Plaintiffs did not have a recollection of the specific details of these stops and varied when describing their duration and to what extent name checks caused a delay. Dennis testified that a call to the dispatcher for a name check took "maybe two to three minutes," with a "minute or two delay" because other people

were calling in, for a total of "three to seven minutes" for the entire encounter. Several of the other Plaintiffs testified that the warrant checks took anywhere from four to seven minutes. Franks, on the high end, testified that, on one occasion, an estimated eleven to fifteen minutes passed between an officer asking for her ID and returning the ID to her.

Although no Plaintiff suggested that the officers used force or intimidation to obtain their IDs, Plaintiffs testified that they did not feel free to refuse the officers' requests or leave before the officers returned their IDs to them. Gardner, for example, testified that "if you don't give [an ID] to them, they're going to say you resisted, you['re] hiding something … like you have warrants or something on you." He elaborated, "They got your ID card, and if you leave, they'll say you fleeing from a police officer. That's a violation against you." Pindak testified that officers would use "verbal restraint," saying, "You can't go until we're done." He alleges that, when he asked the officers for his ID back, the officers said they would return the ID only "[w]hen they were done." Gardner similarly testified that, during about half of his encounters with police, the officers told him, "We'll let you go if you don't have any warrants, or, If you're clear, we'll let you go."

The officers completed some contact cards following interactions where they had observed one of the Plaintiffs violating the Aggressive Panhandling Ordinance. A contact card for Dennis, for example, reads, "Subject observed panhandling within 15 feet of a bus stop in violation of city ordinary [sic]. Subject warned, name check clear." Another for Hubbard indicates, "Subject walking up to people asking for money. [Responding Officer] informed Subject of panhandling ordinance. Name check clear." Other times, the officers performed

stops for the purpose of completing what the City refers to as "well-being checks." One contact card for Gardner states, "[Responding officer] while on foot patrol observed [Gardner] who appeared to be homeless. [Responding officer] conducted field interview which revealed above was staying at his mom's and would have shelter. Name check: clear." Another for Hall reads, "Subject was appearing faint and affected negatively by the high temperature weather. [Responding officer] asked if he needed medical attn. subject refused. Name check clear."

Plaintiffs filed a suit pursuant to 42 U.S.C. § 1983 against the City of Chicago and individual CPD officers, alleging that the unnecessary delays that result from blanket warrant checks unrelated to the reason justifying the stops constitute unreasonable seizures under the Fourth Amendment. Plaintiffs do not challenge the use of contact cards.

Plaintiffs eventually abandoned their claims against the individual officers but moved for summary judgment against the City, and the City filed a cross-motion. The district court denied Plaintiffs' motion and granted the City's. In doing so, the district court held that if officers have reasonable suspicion of an ordinance violation, they may permissibly detain an individual to investigate the possible violation. Therefore, there was no underlying constitutional violation for Plaintiffs to succeed on a *Monell* theory in these instances. Plaintiffs appealed.

## II. Discussion

We review the district court's summary judgment ruling de novo and consider facts and draw inferences in the light most favorable to the Plaintiffs. *Villas at Winding Ridge v. State*

*Farm Fire and Cas. Co.*, 942 F.3d 824, 830 (7th Cir. 2019). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The Supreme Court held in *Monell* that plaintiffs may sue municipalities under 42 U.S.C. § 1983 when their actions violate the Constitution. *See* 436 U.S. 658. In order to succeed on a *Monell* claim, a plaintiff must ultimately prove three elements: (1) an action pursuant to a municipal policy, (2) culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations, and (3) causation, meaning the municipal action was the "moving force" behind the constitutional injury. *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404–07 (1997). As a threshold matter plaintiffs must demonstrate that the policy at issue violates their constitutional rights. *Sallenger v. City of Springfield*, 630 F.3d 499, 504 (7th Cir. 2010). Thus, as with all Fourth Amendment inquiries, we begin by analyzing whether a search or seizure actually occurred. *Carlson v. Bukovic*, 621 F.3d 610, 618 (7th Cir. 2010). If we determine a seizure did take place, we next analyze whether that seizure was reasonable. *Id.*

### A. Fourth Amendment Seizure

"[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry*, 392 U.S. at 16. The test for whether a seizure has occurred is an objective one—we ask, considering the totality of the circumstances, "whether 'a reasonable person would feel free to terminate the encounter.'" *United States v. Lopez*, 907 F.3d 472, 487 (7th Cir. 2018) (quoting *United States v. Drayton*, 536 U.S. 194, 201 (2002)); *see also Florida v. Bostick*, 501 U.S. 429,

439 (1991); *California v. Hodari D.*, 499 U.S. 621, 628 (1991). "Circumstances that might indicate a seizure include the threatening presence of several officers, display of their weapons, physical touching of the private citizen, use of forceful language or tone of voice (indicating that compliance with the officers' request might be compelled), and the location in which the encounter takes place." *United States v. Clements*, 522 F.3d 790, 794 (7th Cir. 2008) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)); *see also Drayton*, 536 U.S. at 204 (finding a police encounter consensual where there was "no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice" and concluding that a display of an officer's badge or uniform did not render an encounter coercive).

Consequently, merely asking for identification does not amount to a seizure under the Fourth Amendment. The Supreme Court has provided,

> In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. "[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure." … [Q]uestions concerning a suspect's identity are a routine and accepted part of many *Terry* stops. … Knowledge of identity may inform an officer that a suspect is wanted for another offense.

*Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 185–86 (2004) (quoting *INS v. Delgado*, 466 U.S. 210,

216 (1984)). Indeed, "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification … as long as the police do not convey a message that compliance with their requests is required." *Bostick*, 501 U.S. at 434–35 (citing *Delgado*, 466 U.S. at 216; *Florida v. Royer*, 460 U.S. 491, 501 (1983)). We therefore conclude that the officers' initial requests for identification from Plaintiffs do not constitute seizures within the meaning of the Fourth Amendment.[1]

We thus turn our analysis to the issue at the heart of Plaintiffs' claims—whether the time between Plaintiffs handing the officers their IDs and the officers returning their IDs to them is a seizure within the meaning of the Fourth Amendment. While Plaintiffs testified that they did not feel free to leave while police had their IDs, this testimony is irrelevant to our objective inquiry. *Drayton*, 536 U.S. at 202 (The "reasonable person test" is "objective and 'presupposes an *innocent* person.'"). Testimony from the officers that they kept a person's

---

[1] The City also argues that the use of an ID to search public records does not constitute a search or seizure under the Fourth Amendment. *See Willan v. Columbia Co.*, 280 F.3d 1160, 1162 (7th Cir. 2002) (holding that a query of an FBI database for conviction records was not a search within the meaning of the Fourth Amendment because records of conviction are public rather than private documents); *see also United States v. Diaz-Castaneda*, 494 F.3d 1146, 1153 (9th Cir. 2007) ("[T]here is no constitutional basis for complaint when the police properly obtain information located in a driver's license or state ID card, and then use it to access additional non-private (but inculpatory) information about the document's owner."). Plaintiffs, however, do not raise this theory; rather, their Fourth Amendment challenge focuses solely on the extended temporal duration of the police stop because of the name check.

ID for the purpose of preventing them from leaving is similarly irrelevant. *Whren v. United States*, 517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers."). We also conclude Plaintiffs failed to provide evidence that the officers obtained Plaintiffs' IDs through any showing of force, command, or intimidation as the Supreme Court described in *Mendenhall* or *Drayton*.

Nevertheless, Pindak testified that, when he asked for the officers to return his ID, the officers told him that he could not leave until they were finished running his name check. Gardner similarly testified that the officers told him they would let him go if his name check was clear. Consistent with Pindak's and Gardner's testimony, Officer Burns asserted that she instructed individuals on whom she performed name checks that they were "free to go" if their name checks were clear. Considering these explicit instructions in the light most favorable to Plaintiffs, they have raised an issue of fact as to whether a reasonable person would feel free to leave in these circumstances. Plaintiffs therefore have demonstrated a genuine issue of material fact exists as to whether they were seized.

**B. Reasonableness**

We therefore proceed to the question of whether these potential seizures were reasonable under the Fourth Amendment. Because it is uncontested that the officers observed Plaintiffs violating the Aggressive Panhandling Ordinance, they had reasonable suspicion to justify *Terry* stops of these individuals. "It is nevertheless clear that a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests

protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (citing *United States v. Jacobsen*, 446 U.S. 109, 124 (1984)). "A seizure that is justified … can become unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Id.*

Plaintiffs argue that, for a delay resulting from a name check to fall within constitutional limits, an officer needs more than reasonable suspicion that an individual committed the offense for which he or she was stopped: there must also be individualized suspicion to justify the warrant check, such as that the person detained is wanted on a warrant. Otherwise, they contend, the delay is unrelated to confirming or dispelling the suspicion that caused the officer to initiate the stop and is therefore unreasonable. But Plaintiffs too narrowly define the "mission" of a *Terry* stop. In the traffic context, the Supreme Court has said that "[b]eyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to the traffic stop.'" *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (quoting *Caballes*, 543 U.S. at 408). "Typically such inquiries involve … determining whether there are outstanding warrants against the driver." *Id.* "These checks," the Court wrote, "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.*

Accordingly, several sister circuits "have expressly held that officers do not exceed the permissible scope of a *Terry* stop by running a warrant check, even when the warrant check is unrelated to the crime suspected." *United States v. Young*, 707 F.3d 598, 606 (6th Cir. 2012) (citing *Klaucke v. Daly*, 595 F.3d 20, 26 (1st Cir. 2010)); *see also United States v. Christian*, 356 F.3d 1103, 1007 (9th Cir. 2004). We agree. As a warrant

check is part of the "mission" of a proper *Terry* stop, a delay to perform a warrant check is permissible without separate reasonable suspicion that an individual has an outstanding warrant against him, as long as that delay is reasonable.

Plaintiffs note the above cited cases all involve a different circumstance than the one we have here: traffic stops rather than street stops. They argue that the concerns about driving safety that the Court mentioned in *Rodriguez* are not at play with street stops, and thus warrant checks are not incidental to street stops like they are to traffic stops. We are persuaded, though, by the Tenth Circuit's view of this issue. In *United States v. Villagrana–Flores*, 467 F.3d 1269 (10th Cir. 2006), the Tenth Circuit wrote,

> Officer safety … is just as strongly implicated where the individual being detained for a short period of time is on foot, rather than in an automobile. An officer detaining a pedestrian has an equally strong interest in knowing whether that individual has a violent past or is currently wanted on outstanding warrants.

*Id.* at 1277. We therefore hold that an officer's completion of a warrant check during a street stop where the officer has reasonable suspicion of criminal activity is not *per se* unreasonable under the Fourth Amendment.

This is not to say, however, that completion of a warrant check that extends the duration of a street stop is always reasonable. Indeed, the length of the delay impacts the reasonableness analysis. In *Utah v. Strieff*, 136 S.Ct. 2056 (2016), the Supreme Court held that running a warrant check incidental to a traffic stop did not require application of the exclusionary

rule because "[t]he officer's decision to run the warrant check was a 'negligibly burdensome precaution' for officer safety." *Id.* at 2063 (quoting *Rodriguez*, 575 U.S. at 356). Thus, while a warrant check may cause *some* delay, that delay must not be unduly prolonged. *See also Arizona v. Johnson,* 555 U.S. 323, 333 (2009) ("An officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not *measurably* extend the duration of the stop." (emphasis added)). We similarly have suggested that duration is an important consideration when determining reasonableness. We have said, for example, that checking a driver's criminal history on a computer in a patrol car is "normally reasonable, as it takes little time and may reveal outstanding arrest warrants." *United States v. Sanford*, 806 F.3d 954, 956 (7th Cir. 2015); *see also United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (en banc) ("[Q]uestions that do not increase the length of detention (or that extend it by only a brief time) do not make custody itself unreasonable.").

Here, most Plaintiffs testified that they estimated that warrant checks typically delayed the stops by anywhere from four to seven minutes. No reasonable jury could find that this length of delay is objectively unreasonable in these circumstances, particular when Plaintiffs were unable to recall any of the specifics of their alleged encounters with police. *See United States v. Teslim*, 869 F.2d 316, 322 (7th Cir. 1989) (holding a detention lasting five to seven minutes was reasonable because of its brief duration); *United States v. Robinson*, 455 F.3d 832, 834 (8th Cir. 2006) (noting cases in which seizures of less than ten minutes were upheld as *de minimis* intrusions that did not amount to unreasonable seizures). Even viewing the evidence in the light most favorable to the Plaintiffs, the longest delay

a Plaintiff estimated—eleven and fifteen minutes, as Franks claimed—appears to be an outlier. But in any event, this extended time frame still is within the bounds of what this Court and our sister circuits have determined to be reasonable when officers have reasonable suspicion for the stop. *See, e.g., United States v. Street*, 917 F.3d 586, 597 (7th Cir. 2017) (concluding that a stop lasting ten to fifteen minutes was reasonable under the circumstances); *United States v. Jones*, 289 Fed.Appx. 593, 599–600 (4th Cir. 2009) (per curiam) (approving of a twenty minute traffic stop); *United States v. Olivera-Mendez*, 484 F.3d 505, 508, 510 (8th Cir. 2007) (concluding fifteen minutes waiting for dispatcher to respond with results of a name check was reasonable); *United States v. Purcell*, 236 F.3d 1274, 1279 (11th Cir. 2001) (approving of a fourteen minute stop). Plaintiffs have therefore failed to raise an issue of fact that they suffered underlying constitutional violations during stops where the officers had at least reasonable suspicion that Plaintiffs were engaged in criminal activity.

In a footnote, without any legal citation, Plaintiffs state that "detaining a citizen for the sole purpose of running his or her name for warrants in the absence of individualized reasonable suspicion of criminal wrongdoing constitutes an unreasonable seizure." They later argue that the district court erred by ignoring ample evidence that police detained citizens for warrant checks without reasonable suspicion of a crime. But Plaintiffs never develop a separate legal argument about why name checks in this context are constitutionally suspect. Instead, the section of Plaintiffs' opening brief discussing their theory as to the underlying Fourth Amendment violations focuses entirely on the delays from name checks performed during otherwise proper *Terry* stops. "We have announced that '[i]t is the parties' responsibility to allege facts

and indicate their relevance under the correct legal standard.'" *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) (quoting *Econ. Folding Box Corp. v. Anchor Frozen Foods Corp.*, 515 F.3d 718, 721 (7th Cir. 2008)); *see also Ajayi v. Aramark Business Servs., Inc.*, 336 F.3d 520, 529 (7th Cir. 2003) ("[I]f [a plaintiff] intends to challenge [an] aspect of the district court's ruling, she must identify the legal issue, raise it in the argument section of her brief, and support her argument with pertinent authority."). Plaintiffs thus have waived any argument that delays resulting from warrant searches performed without reasonable suspicion, such as during well-being checks, are unreasonable under the Fourth Amendment.

Therefore, because name checks of a reasonable duration performed when officers have reasonable suspicion of ongoing criminal activity do not violate the Fourth Amendment, Plaintiffs have failed to raise an issue of fact that they suffered an underlying constitutional violation. The City thus cannot be liable under *Monell*.

AFFIRMED.