

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-27-2009

# Snell v. York

Precedential or Non-Precedential: Precedential

Docket No. 07-4439

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

## Recommended Citation

"Snell v. York" (2009). *2009 Decisions.* Paper 1422.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1422

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-4439
(Consolidated with Nos. 07-4437 and 07-4438)
_____

EDWARD D. SNELL,
Appellant

v.

CITY OF YORK, PENNSYLVANIA;
MAYOR JOHN S. BRENNER, in his official capacity;
COMMISSIONER MARK L. WHITMAN,
in his official capacity;
RONALD CAMACHO, York Police Department,
in his official and individual capacities
_____

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil No. 06-cv-02133)
District Judge: Honorable John E. Jones, III

_____

Argued October 23, 2008

Before:  RENDELL, and SMITH, <u>Circuit Judges</u>,
and POLLAK,* <u>District Judge</u>.

(Filed:  April 27, 2009)
_____

Randall L. Wenger, Esq.  **[ARGUED]**
Dennis E. Boyle, Esq.
Suite 200
4660 Trindle Road
Camp Hill, PA   17011   *Counsel for Appellants*
   *John McTernan; John R. Holman; Edward D. Snell*

Donald B. Hoyt, Esq.
Blakey, Yost, Bupp & Rausch
17 East Market Street
York, PA   17401

_____

*Honorable Louis H. Pollak, Senior Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation.

2

Frank J. Lavery, Jr., Esq.
James D. Young, Esq.   **[ARGUED]**
Lavery, Faherty, Young & Patterson
225 Market Street, Suite 304
P. O. Box 1245
Harrisburg, PA   17108-0000
  *Counsel for Appellees*
  *City of York, Pennsylvania;*
  *Mayor John S. Brenner, in His Official Capacity;*
  *Police Commissioner Mark L. Whitman, in His Official*
*Capacity;  and Ronald Camacho*

_____

OPINION OF THE COURT
_____

RENDELL, Circuit Judge.

Appellant Edward Snell appeals from the District Court's grant of summary judgment and dismissal of his *Monell* claims for municipal liability in this action pursuant to 42 U.S.C. § 1983.  Snell is a pro-life advocate who regularly speaks to pregnant women as they enter the medical clinic  (hereinafter "Clinic" or "Facility") of Planned Parenthood of Central Pennsylvania ("Planned Parenthood") in York, Pennsylvania. Appellee Sergeant Ronald Camacho, a member of the City of York police department, is one of several officers assigned to overtime detail at the clinic under a contract between Planned Parenthood and the City.  Snell Appendix ("S.A.") 274-77. Detailed officers are required to enforce the law and maintain

order at the clinic. McTernan Appendix ("M.A.") 183. To dissuade pregnant women from undergoing an abortion, Snell emphasizes the sanctity of the fetus, distributes pro-life literature, and discusses alternatives to, and the health risks of, abortion. S.A. 254-55. Snell's activities emanate from deeply rooted Christian religious beliefs. S.A. 255-56.

This case and those of two other protesters at the Clinic (*McTernan v. City of York*, No. 07-4437; and *Holman v. City of York*, No. 07-4438) were consolidated for oral argument. Each of the three appellants sued individually complaining of restrictions on his First Amendment rights of free speech, peaceful assembly, and religious expression. Additionally, Snell and Holman complain that their arrests for activity outside the Clinic violated their Fourth Amendment rights. While certain facts as stated in the three appeals are similar, the claims of each plaintiff were separately asserted in, and decided by, the District Court. We therefore write separately on each case, and we note that the analysis as it relates to Snell differs from the others somewhat, based on the nature of the government conduct at issue.

The Clinic and its environs are described in full in our Opinion in *McTernan v. City of York,* No. 07-4437, filed concurrently herewith, and that description will not be repeated here.

## I. BACKGROUND

On November 3, 2004, Appellee Sergeant Ronald Camacho was stationed at the Planned Parenthood clinic on

4

overtime duty. He advised abortion protesters, including Appellant Edward Snell, that they were prohibited from entering Rose Alley. S.A. 156, 168, 256. Several days later, at the hearing on Snell's disorderly conduct charge, Sergeant Camacho explained the purpose of the restriction: "Number, one, I didn't want any more physical contact between Planned Parenthood people and the anti-abortion protesters. And, number two, again, it's a busy alleyway. I didn't want anybody getting hit by any vehicles." S.A. 327-28. Sergeant Camacho indicated that he did not communicate the restriction to Planned Parenthood escorts, who were permitted to accompany patrons across the alley. S.A. 156.

Shortly after 8:00 A.M. on November 3rd, a Planned Parenthood patron, Dorothy Sponseller, stopped her car briefly in Rose Alley to obtain directions. S.A. 316. As Snell approached Sponseller's car, Peggy Welch, Planned Parenthood's director of client services, intercepted Snell and asked him to step aside. S.A. 316-18, 321. Snell returned to the curb, and Sponseller deposited her daughter at the rear entrance of the Clinic, looped around the block, and parked in the Clinic's front lot. S.A. 316-19. There, three Planned Parenthood escorts joined her. S.A. 317. As the group crossed the alley toward the Clinic, Snell approached Sponseller to hand her a pamphlet. S.A. 169, 319. Witnesses' accounts differ as to whether Snell impeded Sponseller's progress to the Clinic;[1]

_____

[1] Snell testified that he merely approached Sponseller in the alley to hand her a pamphlet and did not "run[] into or obstruct[]" her. S.A. 258. At the preliminary hearing, Peggy

5

however, it is undisputed that he did not "actually stop" Sponseller, and that Sponseller, walking around Snell, was only momentarily delayed. S.A. 305, 156. Afterwards, Sergeant Camacho admonished Snell, threatening to arrest him if he entered Rose Alley again. S.A. 169, 322.

Approximately ten to twenty-five minutes later, a second patron entered the alley. S.A. 169. It is not clear whether the second patron was walking or driving when Snell approached – conflicting evidence was offered. Snell testified that the second patron was on foot, accompanied by several Planned Parenthood

---

Welch also testified that she did not observe physical contact between Snell and Sponseller, and that Sponseller and Planned Parenthood personnel simply walked around Snell. S.A. 305. Although Sponseller does not allege physical contact occurred, she testified that Snell was "very close, very - right in our face. That's the way I would call it, right in our face. I mean, I'd say - I don't think he meant anybody any harm. He was just determined to get his point across whether we wanted to hear it or not." S.A. 315. Stephen Neubauer, a Planned Parenthood volunteer, did not indicate Snell's physical proximity to Sponseller but testified that Snell "positioned himself in front of Ms. Welch and the other woman who was going in and attempted to give them literature, and also in my opinion he was blocking their way." S.A. 295. Finally, Sergeant Camacho testified that he observed "bumping" between Snell and Sponseller or one of her escorts; however, no "serious" physical contact occurred -- "it was just kind of like forcing the literature on them and making some sort of physical contact."

6

escorts. S.A. 169-170. Walsh corroborated Snell's account: "And the next time we began to walk someone across the alley, Mr. Snell walked forward . . . ." S.A. 304, 307. However, Sergeant Camacho, testifying that Snell came "close to the vehicle," suggested that the second patron was in her car when Snell approached. S.A. 156.

When the second patron entered the alley, Snell stepped off the curb to engage her, and was promptly arrested by Camacho for disorderly conduct.[2] Snell testified that he was approximately five feet from the client, and witnesses essentially concurred.[3] S.A. 169-70, 296, 305-306.

After his arrest, a backup policeman, Officer Hernandez, re-cuffed Snell. Snell complains that Officer Hernandez affixed the cuffs too tightly, leaving them sore and bruised. Snell did

---

[2] Snell alleges that Sergeant Camacho "grabbed him [me] from behind, [and] pulled his [my] arms around to the back." Appellant's Br. at 7; S.A. 257. Sergeant Camacho denied doing so, noting that Snell's compliance with his instruction to place his arms behind back made force unnecessary. S.A. 156.

[3] For example, Neubauer testified that Snell "stepp[ed] into the alley to accost another patient, whereupon he was arrested." S.A. 296. Welch also testified that Sergeant Camacho intervened before Snell reached the second patron. S.A. 305-306. Finally, Sergeant Camacho testified that, "He [Snell] stepped into the alleyway. Once he did that I arrested him." S.A. 156.

7

not complain to Sergeant Camacho or seek medical treatment. S.A. 150-57, 170, 174, 257.

District Justice Haskell dismissed the summary citation but expressed the view that Snell's aggressive tactics, which risked creating a "donnybrook" in the alley, approached the line of disorderly conduct. S.A. 183-84.

Snell filed suit in the United States District Court for the Middle District of Pennsylvania under 42 U.S.C. § 1983, claiming violations of his First Amendment rights of free speech, peaceful assembly, and religious expression. In his complaint, Snell named as defendants the City of York, Mayor John Brenner and Police Commissioner Mark L. Whitman in their official capacity, and Sergeant Camacho, in his individual and official capacities. Snell sought declaratory relief, temporary and permanent injunctions, and compensatory and punitive damages.

Defendants Brenner, Whitman, the City of York, and Sergeant Camacho jointly filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6). Claims against Defendants Brenner, Whitman, and Sergeant Camacho in their official capacity were dismissed. S.A. 4-5 (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (noting that "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity[,]" since "[i]t is not a suit against the official personally, for the real party in interest is the entity.")). Dismissing Snell's municipal liability claim against the City, the District Court found that Snell failed to identify a municipal "custom or policy" of depriving him of his constitutional rights. S.A. 5-9.

Claims against Sergeant Camacho in his individual capacity, however, survived dismissal. S.A. 10.

After discovery, the District Court granted summary judgment in favor of Sergeant Camacho on Snell's First and Fourth Amendment claims. Following form with its analysis of McTernan's Free Exercise claim, the Court concluded that the restriction enforced by Sergeant Camacho was "neutral," "generally applicable," and only "incidentally burdened" Snell's religious expression and, therefore, withstood constitutional review. The District Court determined, alternatively, that the restriction survived strict scrutiny, as it was narrowly tailored to promote public safety and traffic flow in Rose Alley – "compelling" governmental interests.

Turning to the free speech and peaceful assembly claims, the District Court found that the restriction survived intermediate scrutiny because it was content-neutral, narrowly tailored to serve a compelling governmental interest, and left open ample alternative channels for communication of information.

As to the claim of unlawful arrest and excessive force under the Fourth Amendment, the District Court concluded that Sergeant Camacho acted reasonably in believing that "Snell intended to cause public inconvenience, annoyance, or alarm by creating a hazardous or physically offensive condition by an act

9

that serves no legitimate purpose."[4] 18 Pa.C.S.A. § 5503(a)(4).

The District Court concluded that the excessive force claim failed because Officer Hernandez – not Sergeant Camacho – applied the handcuffs too tightly. Since Sergeant Camacho had no personal involvement in the misconduct alleged, he was not liable for Snell's injuries. The District Court also rejected Snell's alternative theory – that any force applied in executing an unlawful arrest is excessive *per se* – because Sergeant Camacho had probable cause to arrest Snell for disorderly conduct. S.A. 32.

On appeal, Snell urges that: his rights of free speech, peaceful assembly,[5] and religious expression were burdened by the restriction placed on him and by his arrest; the restriction was neither "neutral" nor "generally applicable"; there was no compelling interest in safety, especially because the Planned

---

[4] The District Court noted that Sergeant Camacho observed Snell move into the path of individuals crossing Rose Alley and make physical contact with these individuals. S.A. 31. Accordingly, "[w]hen Sergeant Camacho observed Snell enter the alley again," Sergeant Camacho reasonably concluded that Snell "intended to cause a public inconvenience or annoyance by an act that serves no legitimate purpose." S.A. 31.

[5] Snell summarily references his claim of right of assembly, Appellant's Br. at 20, but does not set forth a separate argument in his brief. For purposes of our analysis, we conclude that this claim is encompassed in his free speech claim.

10

Parenthood escorts and patients routinely crossed the alley at the same location; and, finally, less restrictive means existed to protect public safety in the alley, including having Sergeant Camacho direct traffic. Snell urges, moreover, that probable cause was lacking for his arrest because he neither created a hazardous condition nor intended to cause a public inconvenience or annoyance.

## II. FIRST AMENDMENT CLAIMS

We incorporate herein the discussion of the standards applicable to Snell's Free Exercise and Free Speech claims from our opinion in *McTernan v. City of York,* No. 07-4437, filed concurrently herewith.[6] While the specific conduct here – on the parts of both the protester and the police – differs somewhat from the conduct alleged in *McTernan*, our concerns are quite similar.

### A. Free Exercise

The issue as to whether the restriction enforced by Sergeant Camacho was "neutral" and "generally applicable" is more easily resolved than in McTernan's case. Here, there is uncontroverted evidence that Snell was treated differently than others using the alley, namely Planned Parenthood escorts and

---

[6]The basis of our jurisdiction, and the standard of review applicable to the Court's grant of summary judgment, are set forth in *McTernan v. City of York,* No. 07-4437, which we expressly incorporate herein.

patients.[7]  Prior to his encounter with Sponseller, and several times thereafter, Snell was told that he could not enter the alley; they were not. S.A. 156, 168, 256.  Snell was admonished when he approached Sponseller and the second patron in the alley; they were not.  Snell was arrested while disobeying Sergeant Camacho's order; they were not. S.A. 156.  We conclude that in Snell's case, there is no question for a jury.  No reasonable jury could find that the restriction, enforced solely against Snell, was "generally applicable."[8]

---

[7] Emphasizing that Planned Parenthood volunteers were nearby when Sergeant Camacho admonished Snell and other pro-life advocates to stay out of Rose Alley, the District Court reasoned that Sergeant Camacho intended the challenged prohibition to apply to protesters and Planned Parenthood personnel. The Court's conclusion is controverted by Sergeant Camacho's description of the restriction and its target audience. In his deposition, Sgt. Camacho acknowledged that he solely directed protesters to stay out of the alley and permitted volunteers to accompany patrons back and forth across the alley. S.A. 156, 168, 256.

[8] A restriction on religiously motivated expression is subject to strict scrutiny unless it is "generally applicable" *and* "neutral." A regulation is not "neutral" if its "object . . . is to infringe upon or restrict practices because of their religious motivation."  Here, there is no evidence that the restriction was motivated by hostility to Snell's religious beliefs, as opposed to safety concerns.  Accordingly, the restriction complies with the principle of "neutrality."  This conclusion flows from the

If not generally applied, a restriction burdening religiously motivated expression must satisfy strict scrutiny – that is, it must serve a compelling government interest and must be narrowly tailored to serve that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993); *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 172 (3d Cir. 2002). Relying on precedent and the specific facts here, the District Court concluded that the restriction served a "compelling" government interest – promoting traffic safety and the free flow of cars and pedestrians in the alley. For its conclusion, the Court cited *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357, 369, 375-76 (1997) and *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 767-68 (1994), where the Supreme Court, applying intermediate scrutiny, identified as "significant" the government's interest in promoting vehicular and pedestrian safety and traffic flow. The District Court also emphasized certain characteristics of the alley exacerbating the safety hazard presented, including its narrow physical dimensions and the presence of heavy trucks – conditions that twice nearly resulted in accidents.

Our concerns here mirror those expressed in *McTernan*. Was the safety interest vis-à-vis Snell's activity truly compelling, given the frequency with which pedestrians and

discussion of Snell's free speech claim below. We do not repeat that analysis here. Although the District Court's grant of summary judgment on the "neutrality" prong was correct, we apply strict scrutiny because a reasonable jury could conclude that the restriction was not "generally applicable."

13

drivers were in, and crossing, the alley?  Was Snell, who engaged patrons crossing the alley in exactly the same location as Clinic escorts, doing anything more dangerous than Clinic escorts who were granted unfettered access to the alley?  Did Snell's complete exclusion from the alley truly represent the least restrictive means of avoiding violent altercations and promoting vehicular safety?  These are questions for the jury, which should not have been decided on summary judgment.

We pause specifically to address two governmental interests asserted by Sergeant Camacho, which were not urged by the defendant officer in *McTernan*: ensuring patient access to the Clinic and protecting clients from physical harassment. Appellant's Br. at 28.  Neither interest, we conclude, is "compelling" on the facts before us.

As to Clinic access, Sergeant Camacho failed to demonstrate that Snell significantly impeded access to the Facility.  It is undisputed that Snell did not "actually stop" Sponseller, and that Sponseller was only momentarily delayed in her progress to the Clinic.  S.A. 155-56, 305.  Sponseller acknowledged, moreover, that Snell's overarching aim was not to block her ingress to the Clinic but rather to communicate his perspective – to "get his point across."  S.A. 315.  In rejecting Sergeant Camacho's access argument, we also contrast Snell's conduct with the impediments addressed in other abortion protest cases, where hundreds of advocates imposed physical blockades on clinic driveways and entrances. *See Madsen*, 512 U.S. at 758 (upholding fixed buffer zone around reproductive health clinic, where throngs of up to 400 protesters would congregate in the clinic's driveways, surround clinic patients,

14

and picket outside of clinic employees' private residences).[9]

We are also unpersuaded that the "contact" between Snell and Sponseller – brief, isolated, and without attendant injury – poses a "compelling" public safety threat, justifying the challenged restriction. Sergeant Camacho, conceding the contact was *de minimis*, characterized the encounter as not "serious" and "just kind of like forcing the literature on them and making some sort of physical contact." S.A. 155-56. The essentially peaceful nature of the exchange is confirmed by Sponseller, who emphasized that Snell did not "mean[] anybody harm," and that she simply walked around Snell. S.A. 305, 315. Further, no pattern of violence or unruliness at the Clinic is alleged. The handful of protesters typically present at the Clinic are generally peaceful. The scene here, therefore, contrasts

---

[9] *See Schenck*, 519 U.S. at 362-63 (upholding fixed buffer zone around reproductive health clinic where dozens of protesters would conduct "large-scale blockades" of clinic driveways and entrances); *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 192 (2d Cir. 2001) (upholding limited buffer zone around reproductive health clinic where protesters shouted at close range, blocked vehicular and pedestrian access until clients "gave up," and "distracted oncoming cars in aggressive ways"); *Nat'l Org. for Women v. Operation Rescue*, 37 F.3d 646, 649 (D.C. Cir. 1994) (upholding injunction prohibiting obstructing access to reproductive health clinic where protesters engaged in day-long physical blockades of clinic, "creating a risk of physical or mental harm to patients.").

15

sharply with the chaos described at the reproductive health clinic in *Schenck*, 519 U.S. at 362-63. There, scores of protesters threw themselves on top of the hoods of cars, grabbed pregnant women and volunteers with "varying levels of belligerence," and elbowed and spit on clinic volunteers – tactics that often triggered physical altercations. *Id.* The scene here, moreover, differs markedly from that depicted in *Madsen*, where throngs of up to 400 protesters, congregating outside a reproductive health clinic, overwhelmed law enforcement. 512 U.S. at 758. We conclude that the brief, isolated encounter alleged here, involving *de minimis* contact by a single protester against a single client, does not establish a "compelling" public safety hazard as a matter of law.

Whether the interests asserted by the government, individually or in combination, are "compelling" is thus properly an issue for jury determination. Finding the District Court's grant of summary judgment on Snell's Free Exercise claim to be error, we will remand the issue for jury decision.

## B. Free Speech

Our concerns with the District Court's analysis of the free speech issue in *McTernan* are also present here. Although we conclude that the challenged restriction was content-neutral, advanced an important governmental interest, and left adequate alternatives for communication of information, we have substantial doubt that it complied with the "tailoring" requirement mandated under heightened scrutiny. For the reasons set forth below, we will thus remand the issue for jury determination.

16

### 1. Content-Neutral

As to content neutrality, as in *McTernan*, there is no evidence of police hostility to Snell's pro-life message. While it is clear that Snell was treated differently than Planned Parenthood personnel, Snell fails to identify statements or conduct by Sergeant Camacho demonstrating animus to his substantive views. If a jury were to conclude that safety concerns did not motivate Sergeant Camacho, could they conclude that his treatment of Snell was prompted by disagreement with Snell's pro-life message? We think not. As we noted in our opinion in *McTernan,* there must be some evidence tending to show that Sergeant Camacho's articulated concern for traffic safety was a pretext for viewpoint discrimination. Here, that would be a matter of unsupported conjecture.

### 2. Narrowly Tailored to Serve a Significant Government Interest

Under the second prong of *Ward*, a content-neutral restriction on the time, place, or manner of speech must serve a significant government interest and be narrowly tailored to serve that interest. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984**))**.

#### (i) Significance of the Governmental Interest

The District Court determined that the restriction

enforced by Sergeant Camacho promoted traffic safety and traffic flow in Rose Alley – interests that the Court found "compelling." We rejected that conclusion in our analysis of Snell's Free Exercise claim, but find that the government interest in protecting public safety and ensuring the free flow of traffic in Rose Alley, while not "compelling," was real and could be termed, "significant."

Our reasoning here largely mirrors our analysis in *McTernan*, where we addressed a similar factual situation. There, we underscored the risk of collisions between drivers, clients, personnel, and protesters in Rose Alley. That hazard, we found, was exacerbated by the specific characteristics of Rose Alley, including its narrow physical dimensions and the presence of large trucks. These concerns, centering on the layout and use of the alley, apply with equal force here. Accordingly, we conclude that the government interest in promoting traffic safety and traffic flow in Rose Alley, while not "compelling," were "significant."[10]

### (ii) Narrowly Tailored

We now consider whether the challenged restriction was

---

[10] Finding that the second *Ward* element is satisfied here because the government had a "significant" interest in promoting traffic safety and traffic flow in Rose Alley, we need not decide whether the second governmental interest asserted – preventing physical altercations in the alley – is also "significant."

narrowly tailored. In *McTernan*, we observed that speech restrictions embodied in the form of oral police directives present a greater risk of arbitrary enforcement than legislative enactments, justifying a "more searching" review. Accordingly, in *McTernan*, we applied heightened rather than intermediate scrutiny. Similar concerns support the application of heightened scrutiny here. As in *McTernan*, the challenged restriction here was embodied in oral directive, issued *ad hoc* by Sergeant Camacho without reference to any formal administrative or policy channels.[11] Accordingly, the directive here presents a similar risk of arbitrary or unreasonable enforcement. Hence, we will apply heightened scrutiny, upholding the restriction only if it "burden[s] no more speech than necessary" to serve the interest asserted. *Madsen*, 512 U.S. at 765.

Here, we cannot conclude that the challenged restriction "burden[s] no more speech than necessary" to protect traffic safety in Rose Alley as a matter of law. *Madsen*, 512 U.S. at 765. Snell identifies a plausible alternative to safeguard pedestrians and drivers without curtailing advocates' First Amendment rights. Sergeant Camacho, he urges, could have directed traffic at the intersection of Beaver Street and Rose

---

[11] Although Sergeant Camacho allegedly consulted with the Assistant District Attorney, Bill Graff, about whether a protester who physically contacted a client could be arrested for disorderly conduct, there is no allegation or evidence that Graff advised Sergeant Camacho on traffic abatement measures in the alley, including restricting pedestrian access to Rose Alley. S.A. 156.

19

Alley. As we explained in *McTernan*, this approach would have enabled Snell and other advocates to communicate with clients in the alley safely. The District Court did not address this alternative but concluded that the restriction was "narrowly tailored." It was error for the District Court to conclude that excluding protesters from Rose Alley necessarily constituted the least restrictive means of protecting public safety.

The significant fact issues present here also preclude summary judgment on the "tailoring" requirement. A restriction cannot be "narrowly tailored" in the abstract; it must be tailored to the particular government interest asserted. Only when the contours of that interest are clear may we decide whether the means selected to accomplish it have been "narrowly tailored." Here, Sergeant Camacho cited traffic safety to justify restricting access to Rose Alley. We previously identified traffic safety as a "significant" governmental interest, but query whether the safety issues are sufficiently defined, on the record before us, to sustain summary judgment that the restriction was "narrowly tailored" to that interest. We conclude that significant fact questions persist, precluding summary judgment on this issue. As we noted in *McTernan*, largely unknown is how drivers, advocates, and clinic personnel interacted in the alley. Absent this information, we are hard pressed to conclude, as a matter of law, that Sergeant Camacho selected the "least burdensome" alternative to promote traffic safety in the alley.

Other evidence confirms that a triable issue existed, and that summary judgment was improper on the issue of "tailoring." The three appellee-officers assigned security detail at Rose Alley adopted distinct approaches to address the safety

20

hazard allegedly created by protesters' activities in the alley. Sergeant Camacho excluded advocates outright from the alley, but granted Planned Parenthood personnel unfettered access to it. S.A. 156, 168, 256. Officer Koltunovich, by contrast, cautioned advocates about potential safety hazards but did not restrict access. Holman Appendix ("H.A.") 188-89. Finally, Officer Barth prohibited individuals from lingering or walking "aimlessly" in the alley. M.A. 165-66, 183, 220, 224. These divergent approaches only serve further to undermine our confidence that Sergeant Camacho selected the "least burdensome" alternative to promote traffic safety in the alley.

Nor are we persuaded that prohibiting protesters from entering Rose Alley represented the least restrictive means of avoiding confrontations between patients and protesters and ensuring patient access to the Clinic. As we noted, there is no evidence of physical altercations among clients, volunteers, and the handful of protesters typically present at the Clinic. Although Sergeant Camacho maintains that Snell made physical contact with Sponseller, he concedes that the contact was momentary, harmless, and did not impede Sponseller's progress to the Clinic. There is no evidence that Sergeant Camacho could not have managed a potential dispute between a protester and a patron. On this sparse record, we cannot conclude that the challenged prohibition represented the least restrictive means of preserving order at the Clinic. Accordingly, we will remand the issue for jury determination.

### 3. Adequate Alternatives

The final *Ward* requirement is that the restriction leave

ample opportunities for communication of information. The District Court concluded that Snell, capable of espousing his views from several public sidewalks surrounding the Clinic, possessed adequate alternatives to convey his pro-life message. S.A. 29. Snell's contention on appeal is a narrow one. He expresses dissatisfaction with the impediments to speech that he encounters – Planned Parenthood personnel and railings at the rear ramp of the facility that purportedly block his access to the patrons themselves. His argument, that the alley presents the "best opportunity . . . momentarily [to] speak and hand out literature as they [patrons] are crossing the street," is merely that, argument. Appellant's Br. at 15-16 (emphasis added). There is no evidence that escorts interfered with Snell's efforts to distribute literature to patrons, or that the public sidewalk in front of the Clinic did not afford Snell equivalent opportunities to converse "momentarily" with clients. As to the "blockage" due to the railings, we are unpersuaded that a simple metal railing poses an impediment to speech. Hence, the District Court properly concluded that this aspect of *Ward* was satisfied.[12]

## III. FOURTH AMENDMENT CLAIMS

Snell also contends that Sergeant Camacho arrested him

---

[12] We do not address qualified immunity or Snell's right to specific relief, as these issues were not decided by the District Court. S.A. 32-33.

for disorderly conduct without probable cause, and applied excessive force, in violation of his Fourth Amendment rights. We address Snell's arguments in turn.

## A. Unlawful Arrest

Snell argues that his arrest for disorderly conduct was unsupported by probable cause. Under Pennsylvania law, disorderly conduct requires proof that a person (1) "with intent to cause public inconvenience, annoyance, or alarm" (2) "creates a hazardous or physically offensive condition by any act" that (3) "serves no legitimate purpose of the actor." 18 Pa. C.S. § 5503(a)(4). Snell maintains that he merely intended to distribute literature – not to cause public harm or inconvenience – and that his peaceful distribution of literature in Rose Alley did not create a "hazardous or physically offensive condition." The District Court concluded that Sergeant Camacho had probable cause to arrest Snell for disorderly conduct, after Snell twice ignored Camacho's warning to stay out of the alley. However, reviewing the evidence in the light most favorable to Snell, we identify genuine fact issues, precluding summary judgment. *AT&T v. JMC Telecom, LLC*, 470 F.3d 525, 530 (3d Cir. 2006).

In assessing the presence of probable cause, a court must determine the fact pattern the officer encountered and, in light of that, whether the arresting officer had "probable cause to believe that a criminal offense has been or is being committed." *Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997). The Court has explained the standard as whether, "at the moment the arrest was made, the officers had probable cause to make it." *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (quoted in *U.S. v. Burton*, 288

23

F.3d 91, 98 (3d Cir. 2002)). In other words, "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Id*. "Mere suspicion," however, is insufficient. *Burton*, 288 F.3d at 98 (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482-83 (3d Cir. 1995)).

Notwithstanding the District Court's conclusion that Sergeant Camacho acted reasonably, we are not so sure. For one thing, we cannot discern exactly what occurred. While the various accounts as to the encounter with Sponseller are confusing, the evidence as to what happened thereafter – which was the basis for the arrest – is even less clear. Did Snell approach a car, or was the second patron on foot? What was his exact distance from that patron? What aspect of what he did created a "hazardous or physically offensive" condition?[13]

---

[13] Regarding the initial encounter with Sponseller, it is also unclear whether Snell actually touched Sponseller or impeded her progress to the Clinic. Snell testified that he merely approached Sponseller in the alley to hand her a pamphlet and did not "run[] into or obstruct[]" her. S.A. 258. At the preliminary hearing, Peggy Welch also testified that she did not observe physical contact between Snell and Sponseller. S.A. 305. In any event, it is undisputed that Snell did not "actually stop" Sponseller, and that Sponseller, walking around Snell, was only momentarily delayed. S.A. 305, 156.

As noted, approximately ten to twenty-five minutes after

24

Clarification of the specific factual scenario must precede the probable cause inquiry. We conclude that determining these facts was properly the job of the jury, and that a rational jury could find that probable cause was lacking for Snell's arrest because he did not create a "hazardous or physically offensive" condition.

The District Court also apparently relied on the *possibility* of physical aggression by Snell – that is, the Court found that Sergeant Camacho reasonably perceived a possibility that Snell would touch the second patron because of his earlier, alleged conduct towards Sponseller:

> Sergeant Camacho observed Snell enter the alley
> and move into the path of individuals attempting

---

the encounter with Sponseller, a second patron entered the alley on foot, accompanied by Planned Parenthood escorts. S.A. 169. When Snell stepped off the curb to engage her, Sergeant Camacho immediately arrested him for disorderly conduct. It is uncontroverted that, at the time of his arrest, Snell was several feet from the patron and her escorts. S.A. 169-70, 296, 305-306. Snell did not touch the second patron or impede her progress towards the Clinic. He did not verbally harass or threaten her. We assume for purposes of summary judgment that the second patron was on foot, and there is no indication that any other cars were in the alley at the time. On these facts, a rational jury could conclude that Snell did not create a "hazardous or physically offensive condition," and that Sergeant Camacho's contrary determination was unreasonable.

25

to access the facility, and perceived that Snell made physical contact with these individuals. Sergeant Camacho then gave Snell yet another warning. *When Sergeant Camacho observed Snell enter the alley again, he was justified in reasonably believing that Snell intended to cause public inconvenience, annoyance, or harm by creating a hazardous or physically offensive condition by an act which serves no legitimate purpose.*

S.A. 31 (emphasis added). However, the disorderly conduct statute, by its terms, requires the "creation," rather than a possibility, of a "hazardous or physically offensive" condition. Accordingly, a rational jury could find that Officer Camacho lacked probable cause to arrest him.[14] Thus, we will remand this issue for determination by a jury.

### B. Excessive Force

---

[14] Conviction for disorderly conduct requires proof that the actor's conduct "serve[d] no legitimate purpose." Snell contends that his advocacy in the alley served a legitimate purpose – communication of his pro-life message. We conclude in passing, however, that an individual's expression of a personally-held belief does not constitute a "legitimate purpose" that would excuse otherwise disorderly conduct.

Snell contends that his Fourth Amendment rights were also violated when Sergeant Camacho applied excessive force. Snell abandons the argument, urged before the District Court, that Sergeant Camacho should be liable for Officer Hernandez's improper application of handcuffs. Appellant's Br. at 29-30. Snell's sole contention on appeal, instead, is that the force applied was excessive *per se* because the initial arrest was illegal:

> The trial court also erred in finding that Officer Camacho is not responsible for excessive force since it was another officer who put Mr. Snell's handcuff's (sic) on too tight. However, it is not simply the handcuffs that are at issue, but all force used against Mr. Snell as a result of Officer Camacho arresting him. Any force used against Mr. Snell in the circumstances was excessive.

Appellant's Br. at 29-30. Hence, Snell contends that the force applied was excessive solely because probable cause was lacking for his arrest. We have rejected similar efforts to bootstrap excessive force claims and probable cause challenges. *Robinson v. Fetterman*, 378 F.Supp.2d 534, 544 (E.D. Pa. 2005) (citing *Bodine v. Warwick*, 72 F.3d 393, 400 & n.10 (3d Cir. 1995) (rejecting conflation of claims for false arrest and excessive force, noting that "merely because a person has been falsely arrested does not mean that excessive force has been used."); *see Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004) (citing *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921-22 (9th Cir. 2001) ("Because the excessive force and false arrest factual inquiries are distinct, establishing

a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa.")).  Accordingly, we conclude that the District Court properly granted summary judgment on Snell's excessive force claim.

## IV. MUNICIPAL LIABILITY CLAIMS

Finally, Snell contends that the District Court erred in dismissing his *Monell* claims for municipal liability against the City of York.  *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658 (1978).  Snell's complaint is more skeletal than McTernan's.  Whereas McTernan pled that he and other protesters had been prohibited from entering the ally on multiple occasions by different York officers, Snell solely alleges restrictions imposed by a single officer – Sergeant Camacho – on his use of the alley. M.A. at 50.  Incorporating our analysis in *McTernan*, we conclude that the District Court properly dismissed Snell's municipal liability claims against the City and Defendants Brenner, Whitman, and Camacho in their official capacity.

## V. CONCLUSION

In light of the foregoing, we will AFFIRM the Order of the District Court as to its dismissal of appellant's municipal liability claim and his official capacity claims against Sergeant Camacho, Mayor Brenner, and Police Commissioner Whitman.  Further, we will VACATE the Order of the District Court as to the other causes of action and REMAND to the District Court for further proceedings in accordance with this Opinion.

28