In the

# United States Court of Appeals
## For the Seventh Circuit

No. 07-1619

DEBRA WILLIAMS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

CITY OF CHAMPAIGN, *et al.*,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 04-2150—**David G. Bernthal**, *Magistrate Judge*.

ARGUED JANUARY 7, 2008—DECIDED APRIL 29, 2008

Before POSNER, ROVNER, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*.   This is a suit against police officers (and the city, Champaign, Illinois, that employs them, but it need not be discussed), charging false arrest and use of excessive force, in violation of the Fourth Amendment as made applicable to the states by inter-pretation of the Fourteenth Amendment. There is a sup-plemental claim under Illinois law for false imprison-ment and negligence against private security guards and their employer. The plaintiffs, a married couple named Williams, are suing on behalf of themselves and also their minor son, Rashad Williams, who at the time of the inci-

dent that precipitated this lawsuit was 15 years old. The district court granted summary judgment in favor of both sets of defendants.

Mrs. Williams had driven her son and a cousin of his to a mall in her black van, which bore the license plate number RASHAD8. Shortly after they left the mall, one of the mall's private security guards reported to his company's "call taker" that he had "just had a report of a fellow panhandling out here and then, uh, another officer just called me and the same guy robbed two people in the mall." The guard told the call taker that the panhandler-robber was a black male probably in his late 20s or early 30s, that he was about six foot one in height, and that he had been seen leaving the mall in a dark van with a license plate number RASHAD8 and that there was also a black woman in the van. The victims of the robbery were a 12-year-old boy and a 14-year-old boy, one of whom had had $20 taken from him, the other $5.

The call taker entered the information on his computer terminal, from which it was automatically transmitted to the police dispatcher. Armed with the license plate number, the police quickly learned the Williamses' address, drove there, and pulled up in front of their house just as Mrs. Williams and her son were arriving in the van. The officers ordered the occupants out of the van at gunpoint and put Mrs. Williams in one police car and Rashad, handcuffed, in another. The third occupant of the van, the cousin, was put in still a third police car, but he is not a plaintiff, so we say no more about him except that he too was exonerated of any involvement in the robbery.

More police arrived within the next 20 minutes, this time with the victims of the crime, who took a look at

the occupants and said that none of them was the perpetrator. The police immediately released Mrs. Williams, who meanwhile had become terribly upset. She was having trouble breathing and her heart was racing, and so an ambulance was called for her. But it turned out that she had had just a mild panic attack, and she was quickly released by the hospital.

Rashad, still in handcuffs, remained in police custody for about another quarter of an hour while the police filled out a juvenile contact form that it seems they're required to complete whenever they have an encounter with a minor. While filling it out they asked him some questions that he contends were unrelated to the robbery. According to his deposition they asked him "what the tattoos and all that mean on my hands and my legs in the police car, your date of birth and all that," and also asked him "about Jessica Brown, which is my cousin, and they was asking me do I know where she lived. Do I know where she is hiding at and stuff like that. Do I know where I can reach her at and all them kind of questions, and I told them no." The police may have suspected Brown of being mixed up in criminal activity, and wanted to learn her whereabouts, or perhaps she was a missing person.

The security guard who alerted the police to a robbery he thought had been committed by someone in the Williams's van was mistaken, perhaps carelessly; and we shall take up the question of his liability and that of his employer in due course. But his carelessness, if that is the correct characterization of his mistake, cannot be pasted on to the police officers. They could hardly have ignored a security guard's report of a robbery—a detailed report that included a license plate number that led

them directly to the Williams house and van. It is true that the report had not said that the robbery was an *armed* robbery, but neither had it said it wasn't; and it was therefore prudent for the police to assume the worst—that the van might contain an armed criminal. And if you are a police officer with reason to believe there may be an armed robber in a van you approach with utmost caution, which may include pointing a gun at the occupants. *Foote v. Dunagan*, 33 F.3d 445, 448-49 (4th Cir. 1994), and cases cited there; see also *Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989); *Mellott v. Heemer*, 161 F.3d 117, 122-23 (3d Cir. 1998); compare *Jacobs v. City of Chicago*, 215 F.3d 758, 773-74 (7th Cir. 2000). The fact that it was dark by the time the police arrived (the robbery occurred in late afternoon in January), and that they did not know who might be in the Williams home, were additional reasons for caution.

Granted, the robber had been reported to be a male, but the driver of the van, a woman, could have been an accomplice—the report on which the police were acting said that there had been a woman in the van at the time of the supposed robbery—and so it was reasonable for the police to detain Mrs. Williams for the brief period that it took to fetch the victims. Her evident distress complicates the picture, but only slightly. The police had a difficult choice: detain her until the victims arrived, who might and indeed did exonerate her, or call an ambulance immediately. She didn't ask them to call an ambulance, and though she made three cellphone calls from inside the police car where she was being held, including one to her husband, she did not call 911. As far as the police knew, she was merely very upset rather than in danger of some serious medical mishap (in fact, there was no such danger).

Whether in approaching the van with drawn guns or keeping Mrs. Williams in the police car until the victims arrived, the police had had to make snap decisions in a threatening, confusing, and rapidly developing situation. *McNair v. Coffey*, 279 F.3d 463, 467 (7th Cir. 2002). The net of tort liability must not be drawn so tight that police must choose between risking their lives and failing to investigate adequately reports of violent crime. One must also distinguish between a detention, which if unreasonable violates the Fourth Amendment, and an accompanying display (as distinct from use) of force, which may not—an unresolved question, compare *id.* and *Collins v. Nagle*, 892 F.2d 489, 497 (6th Cir. 1989), with *Robinson v. Solano County*, 278 F.3d 1007, 1014-15 (9th Cir. 2002) (en banc), unnecessary to resolve in this case.

As for the brief detention of Rashad Williams, while he is not in his 20s or 30s he is a black male more than six feet tall and it would be easy for the kids who were robbed to mistake the robber's age (everyone looks old to the young), especially as it may already have been quite dark in the mall. Since Rashad otherwise matched the description of the perpetrator and was a passenger in the van described in the dispatch report, the police were right to detain him despite the age mismatch.

But should not his handcuffs have been removed the moment the victims told the police that he was not the perpetrator? The plaintiffs' lawyer does not challenge the right of the police to question a minor in the circumstances in which Rashad found himself, through no fault of his own, so that they can fill out the juvenile contact form. To release him from the handcuffs first while insisting that he remain so that they could complete the form would not have been calculated to elicit a cooperative

response, as he could not be expected to be kindly disposed to the police in view of what had just happened to him and his mother.

Asking him while he was handcuffed questions unrelated to completion of the juvenile contact form is the most troublesome feature of the case. Police cannot be permitted to accost an innocent bystander, handcuff him, and then question him. This case is not quite so raw, however, because it was permissible to handcuff Rashad and the complaint is only that the handcuffs should have been removed a few minutes sooner. In any event, the brevity of the restraint defeats Rashad's claim for damages, which is his only claim. He suffered no harm. Any increment of emotional distress could not have been significant, and there is no suggestion that he said anything to incriminate himself. In constitutional tort cases (including cases brought to vindicate rights created by the Fourth Amendment) as elsewhere in the law, *de minimis non curat lex*. *United States v. Broomfield*, 417 F.3d 654, 655-56 (7th Cir. 2005); *Hessel v. O'Hearn*, 977 F.2d 299, 302-04 (7th Cir. 1992); *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000); *Crawford-El v. Britton*, 951 F.2d 1314, 1321-22 (D.C. Cir. 1991).

Turning to the second set of defendants, the security guards and (by virtue of the doctrine of respondeat superior) their employer, we are given no reason to think that they acted with malice toward the Williamses, deliberately misled the police, or in short committed an intentional tort. False imprisonment, the claim against them that the plaintiffs press the hardest, is an intentional tort. *Toothman v. Hardee's Food Systems, Inc.*, 710 N.E.2d 880, 884-85 (Ill. App. 1999); *Lopez v. Winchell's Donut House*, 466 N.E.2d 1309, 1311 (Ill. App. 1984);

*Cincinnati Ins. Co. v. Eastern Atlantic Ins. Co.*, 260 F.3d 742, 746 (7th Cir. 2001) (Illinois law); *Hood v. City of Chicago*, 927 F.2d 312, 314 (7th Cir. 1991) (same). At worst the security guards were careless.

The plaintiffs intimate that anyone who is careless in reporting a crime to the police should be liable for false arrest if acting on the report the police arrest an innocent person. That would end the reporting of crimes to police by private persons, and is not the law. *Carey v. K-Way, Inc.*, 728 N.E.2d 743, 747 (Ill. App. 2000); *Dutton v. Roo-Mac, Inc.*, 426 N.E.2d 604, 607 (Ill. App. 1981); *Smits v. Wal-Mart Stores, Inc.*, 525 N.W.2d 554, 558 (Minn. App. 1994); *Restatement (Second) of Torts* § 45A, comment c (1965). Maybe security guards should not be thought "private persons" for purposes of this rule; the computer link between the security firm's call taker and the police dispatcher suggests that the police rely on such firms for information about crime to an extent that they would not rely on an ordinary citizen, and maybe therefore the security service should be regarded as an extension or delegate of the police. But the plaintiffs cite nothing to suggest that this is the law; do not ask us to declare it a new rule of Illinois law (which we naturally would hesitate to do); and in short provide no support for the proposition that an erroneous report by a security guard that he would not have made had he been trained makes the guard and his employer liable in tort to a person arrested as a consequence of his error.

The plaintiffs also argue, however, that the guards and their employer violated an Illinois statute that requires armed security guards to be instructed in the elements of crime, 225 ILCS 447/25-20(a)(2), (5), including the crime of robbery, and that if the guards had been so

instructed they would have known that the man in the
mall was a panhandler (an aggressive beggar, Municipal
Code of City of Champaign, Art. V, § 23-95(a)(2)) rather
than a robber. They point out that the violation of a
statute that sets a standard of care is, in Illinois, prima
facie evidence of negligence, *Ney v. Yellow Cab Co.*, 117
N.E.2d 74, 78 (Ill. 1954); *Price ex rel. Massey v. Hickory Point
Bank & Trust No. 0192*, 841 N.E.2d 1084, 1089 (Ill. App.
2006); *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir.
2004) (Illinois law), so that all a plaintiff has to prove
(besides causation) is that the defendant violated the
statute. The defendant can defend by showing that his
behavior was reasonable in the circumstances. *Price ex rel.
Massey v. Hickory Point Bank & Trust No. 0192*, *supra*, 841
N.E.2d at 1089. That is the difference between Illinois's
prima facie rule and the more common rule that violation
of a safety statute is negligence per se. But the defendants
have not proved such a defense in the proceedings to date.

Even so, the plaintiffs cannot prevail because they
cannot prove a causal relation between the violation of the
training statute and the harm they incurred as a result of
the detention of Mrs. Williams and Rashad by the police.
(We do not understand on what basis Mr. Williams is
suing for damages on his own behalf.) Robbery includes
taking property "from the person or presence of another
by . . . threatening the imminent use of force." 720 ILCS
5/18-1(a). The victims of the panhandler/robber were re-
ported to the security guards by the father of one of the
victims as having frightened the boys into giving him
money. That fits the statutory definition of robbery,
which is what the guards would have learned had they
received the instruction that they should have received;
and this means that they would have learned nothing

that would have caused them to respond to the incident differently.

AFFIRMED.