In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2578

JUNE O. CARLSON,

*Plaintiff-Appellant,*

*v.*

SCOTT BUKOVIC, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:07-cv-00006—**Nan R. Nolan**, *Magistrate Judge*.

ARGUED FEBRUARY 17, 2010—DECIDED SEPTEMBER 2, 2010

Before RIPPLE, MANION and SYKES, *Circuit Judges.*

RIPPLE, *Circuit Judge.* June Carlson brought a multi-count civil rights action under 42 U.S.C. § 1983 against Officer Scott Bukovic and the City of Darien, an Illinois municipal corporation. Certain counts were dismissed by the district court and are not at issue in this appeal. Remaining are a Fourth Amendment excessive force

claim against Officer Bukovic and a *Monell*[1] claim against the City for failure to train the officer.[2] With respect to these claims, the parties cross-moved for summary judgment. The district court granted summary judgment in favor of the City on the *Monell* claim but denied summary judgment to both parties on the excessive force claim. That claim proceeded to trial, and a jury determined that Officer Bukovic did not violate Ms. Carlson's constitutional rights because no Fourth Amendment seizure had occurred. Ms. Carlson now appeals the district court's final determination of both the excessive force claim and the *Monell* claim. For the reasons stated in this opinion, we affirm the judgment of the district court.[3]

# I

## BACKGROUND

### A.

The facts surrounding Ms. Carlson's excessive force claim were contested initially. Because the action was tried to a jury, however, we must take the facts in the light most favorable to the party who prevailed at trial,

---

[1] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 701 (1978).

[2] The district court had jurisdiction over the action pursuant to 28 U.S.C. § 1331.

[3] We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

Officer Bukovic, and draw all inferences in his favor. *See Majeske v. City of Chi.*, 218 F.3d 816, 820 (7th Cir. 2000).

On January 3, 2005, Ms. Carlson and her son, Paul Carlson, visited the WalMart store in Darien, Illinois. At that time, Ms. Carlson was approximately 83 years old; Mr. Carlson is a handicapped adult. During their visit to the store, Mr. Carlson scratched his arm on a fire hose box and reported the incident to store employees. The employees consequently requested that Mr. Carlson complete certain forms. During that process, a dispute arose between the store employees and the Carlsons over whether the store would provide Ms. Carlson with copies of the forms. The store manager explained:

> Well, as [Ms. Carlson] was upset and agitated by not having the forms, [Mr. Carlson] made a gesture towards me as to come towards me where I felt like I was threatened by his actions, and then I had asked him to step back, that I had felt threatened by him coming towards me. And there was some—a little bit of commotion. When I did ask him to step back, he did move back, and I remember her saying that, we're not threatening you. And I remember stating, no, I feel threatened, and, you know, I'm asking for him to step back. He made a step again.
>
> And then at some point in time . . . we phoned the police department to help, not to banish them or—but to alleviate the situation because at that point in time, I felt threatened to the point where it was—I would not be able to end the situation.

Trial Tr. at 454-55. A store employee called the City of Darien Police Department to complain that the Carlsons were being disruptive.

Darien Police Officers Scott Bukovic and Richard Stutte soon arrived and asked the store manager what had happened. The manager explained that Mr. Carlson had scratched his arm and that, during the claims process, he had become loud and threatening. Ms. Carlson accused the manager of lying and tried to interrupt Officer Bukovic's conversation with the manager several times. Ms. Carlson's voice was raised; she was upset and, by some accounts, hysterical. She tapped Officer Bukovic on the arm, to which he said, "let me finish with [the store manager], please don't touch me, and then I will get to you." Trial Tr. at 461.

Officer Bukovic spoke next to Mr. Carlson, who explained his side of the story. Officer Bukovic observed Mr. Carlson to be loud and boisterous. Officer Bukovic relayed to the manager what Mr. Carlson had said; the manager reiterated that she had felt threatened. Officer Bukovic believed the manager.

Officer Bukovic then attempted to get Ms. Carlson's side of the story, but she would not explain what had happened. Ms. Carlson said that the manager was lying. Ms. Carlson's manner also was loud and boisterous. Officer Bukovic then asked the store manager what she wanted him to do. The manager said that Mr. Carlson could remain and complete his paperwork, but that Ms. Carlson would have to leave the store because she was being disruptive. Officer Bukovic told Ms. Carlson

that, if she did not leave, he could arrest her for trespass. Ms. Carlson said she would not leave because she was concerned about her son.

Officer Bukovic tried three or more times to convince Ms. Carlson to leave the store, but she would not go. As Officer Bukovic made his last request, he reached for Ms. Carlson's right arm with both of his hands, placing one hand on her forearm and one hand on her upper arm. The touch was a calm, escorting gesture in an attempt to guide Ms. Carlson out of the store. The Personnel Manager of the WalMart, who witnessed the scene, testified that Officer Bukovic "was just asking her to—that it was time to leave the store, I think, and he kind of went like this. . . . To like you would do a grandmother, you know, to sort of maybe turn towards the exit. He barely touched her, and she started screaming." Trial Tr. at 392-93.[4]

The Store Manager of the WalMart testified that "when the officers went to go help [Ms. Carlson] to the front door or escort [her] to the front door, one of them—how can I describe it?—as if you were helping your grandma through the parking lot on an icy day, grabbed her elbow, let me help you to the front." *Id*. at 462.

---

[4] *See also* Trial Tr. at 400 ("He didn't really have any physical actions with her other than when he barely—when he put his arm around her, but that was like you would to your grandmother or something, or mother or something if you were saying, you know, let's go this way. It's more of a guiding manner than—there was no other physical interaction that I saw.").

Ms. Carlson "freaked out" and began flailing her arms. *Id.* at 511. Officer Bukovic grabbed onto one or both of her arms to prevent her from striking him and, at the same time, tried to get her to calm down. Ms. Carlson put her hands up and crossed her arms in front of her chest. The incident lasted no more than five seconds.[5]

After Ms. Carlson had calmed down, Officer Bukovic asked her if she needed any medical attention, but she refused to acknowledge him. Eventually, she left the store. The officers did not arrest Ms. Carlson.

## B.

The Carlsons brought this action against various WalMart corporate entities, the City of Darien and Officer Bukovic. After filing a series of amended complaints, Mr. Carlson abandoned his claims, and Ms. Carlson narrowed her complaint to consist only of a Fourth Amendment excessive force claim against Officer Bukovic and a section 1983 *Monell* claim against the City for failure to train. Importantly, Ms. Carlson disavowed any intention to assert a Fourth Amendment false arrest claim.[6]

The parties cross-moved for summary judgment on both outstanding claims. Ms. Carlson's version of the facts,

---

[5]  *See* Trial Tr. at 187-90, 201-03, 393-400, 412, 469, 488, 511-12.

[6]  *See* Appellant's Br. 22; *see also* Tr. at 20, May 18, 2009 ("We're not bringing a false arrest claim."); Tr. at 4-6, June 5, 2009 ("This is not a false arrest case.").

described in her motion, was very different from the version described by the defendants. She essentially contended that Officer Bukovic attacked and brutalized her in the WalMart store. Ms. Carlson contended that, because Officer Bukovic had touched her, no genuine issue of material fact existed as to whether a Fourth Amendment seizure had occurred. She also claimed, however, that summary judgment was appropriate on the reasonableness of the force used, as well as on the *Monell* claim asserted against the City. The defendants cross-moved for summary judgment on those same issues and also asserted that Officer Bukovic was entitled to qualified immunity.

The district court[7] denied the cross-motions for summary judgment because a genuine issue of material fact existed as to whether Officer Bukovic had seized Ms. Carlson.[8] The district court also concluded that, due to the conflicting factual accounts, a genuine issue of material fact existed as to whether the seizure, assuming one had occurred, was unreasonable. The district court also denied Officer Bukovic qualified immunity due to the factual differences. However, the district

---

[7] The parties agreed to have the case tried before a magistrate judge. *See* 28 U.S.C. § 636(c); *see also* R.15 (joint consent form).

[8] *See* R.82 at 12 ("There is a question of fact as to the nature of the physical interaction between Plaintiff and Officer Bukovic and, thus, summary judgment is not appropriate to either party on this portion of Plaintiff's claim that she was seized in violation of the Fourth Amendment.").

court granted the City summary judgment on the *Monell* failure-to-train claim.

Ms. Carlson asked the court to reconsider its ruling; she argued that the force used by Officer Bukovic, even though minimal, was a seizure as a matter of law. She essentially maintained that *any* touching used by an officer to influence a citizen's movements constitutes a Fourth Amendment seizure. In her view, the district court's contrary ruling was based on a misunderstanding of established Supreme Court precedent governing the law of Fourth Amendment seizure. She further argued that other cases that had determined that, despite the occurrence of some physical contact, no Fourth Amendment seizure had taken place were not controlling. The district court denied that motion.

Prior to trial, Officer Bukovic filed a motion in limine to exclude, among other things, any reference to or statement about Ms. Carlson's lawful presence in the WalMart store. *See* R.112 (item #9).[9] Officer Bukovic argued that, because Ms. Carlson had not advanced a Fourth Amendment false arrest claim, the issue of Ms. Carlson's lawful presence at the WalMart store was

---

[9] Ms. Carlsons's attorney had posed questions during Officer Bukovic's deposition about whether he believed he could have arrested Ms. Carlson for trespassing. Officer Bukovic anticipated that Ms. Carlson intended to discuss the trespass issue at trial.

irrelevant to the excessive force claim to be tried.[10] He contended that, in any event, Ms. Carlson's reading of the Illinois trespass statute was legally incorrect because the criminal law of Illinois prohibits remaining on the property of another after having been asked to leave. Officer Bukovic contended that Ms. Carlson's anticipated presentation of the trespass issue would be erroneous and would mislead the jury. He asked that such evidence be excluded under Federal Rule of Evidence 403.

Ms. Carlson opposed the motion. She contended that the issue of her lawful presence and Officer Bukovic's probable cause to detain her were central to the action. She further argued that the Illinois criminal trespass statute did not apply because the statute included an "open to the public" exception. Tr. at 76-77, May 18, 2009. She maintained that the issue was related to the reasonableness of Officer Bukovic's seizure, and, thus, testimony about the trespass issue should be admissible at trial.

The district court granted the motion in limine, ruling that "injecting the issue of criminal trespass will mislead and confuse the jury and lead to unfair prejudice." R.124 at 5 (citing Rule 403). The district court also ruled:

> Ms. Carlson may argue only that she did not want to leave and that she did not believe she was trespassing because the store was open to the

---

[10] *See* R.112; *see also* Tr. at 18-20, May 18, 2009.

public; she was there during normal business hours; and she was not creating a disturbance. Officer Bukovic, in turn, may argue that he believed Ms. Carlson was trespassing because the store owner wanted her to leave; she refused his order to leave; and she was behaving in a disruptive manner.

*Id.* at 5-6. Over the course of several pretrial conferences, Ms. Carlson asked the district court to reconsider its ruling. However, the district court steadfastly maintained that, because Ms. Carlson had disavowed any intention to assert a Fourth Amendment false arrest claim, the issue of Ms. Carlson's legal status on the WalMart property and Officer Bukovic's probable cause to seize her were irrelevant to the issues to be tried.[11]

With these parameters in place, the district court conducted a four-day jury trial. The evidence consisted of testimony from Officer Bukovic, Ms. Carlson, Mr. Carlson, the WalMart store employees and Ms. Carlson's doctors. The evidence established that Officer Bukovic asked Ms. Carlson to leave the store, and that he momentarily placed his hands on her arm.

Unsatisfied with the parties' proposed jury instructions, the district court crafted instructions using the Seventh Circuit and Ninth Circuit pattern instructions on the law of Fourth Amendment excessive force claims. The district court removed references to arrest situations

---

[11] *See* Tr. at 19-21, May 18, 2009; *see also* R.145 at 12-14.

and, instead, proposed giving instructions on how to determine whether a Fourth Amendment *seizure* had occurred.

Ms. Carlson objected, primarily taking issue with the court's instruction that "in performing his job, an officer can use force that is reasonably necessary under the circumstances." *See* R.151. She maintained that any touching by an officer without probable cause to detain was per se unreasonable. She proposed several alternative instructions. The first would have required the jury to determine whether Officer Bukovic had probable cause to detain her for questioning. Another would have instructed that, if Officer Bukovic lacked probable cause to detain, any "knowing or intentional use of force . . . is automatically [that is, *per se*] unreasonable." *See* Appellant's Br. 24 (brackets in original); *see also* Tr. at 33-37, June 15, 2009. Ms. Carlson also proposed an instruction essentially requiring the jury to find that she was not trespassing because she was in the store during normal business hours. *See* Appellant's Br. 26.

The district court rejected Ms. Carlson's proposed instructions because they misstated the law of Fourth Amendment excessive force claims. The district court decided to give the instructions that it had formulated. The parties also disagreed over how the verdict form should be structured. Ms. Carlson proposed a special verdict form that would have asked the jury nine questions about disputed facts, such as whether Officer Bukovic "intentionally applied some degree of force to

the person of Plaintiff." *See* R.183.[12] Her proposed verdict form also asked the jury to determine whether Officer Bukovic had "probable cause to believe that Plaintiff was committing the crime of disorderly conduct" and "the crime of criminal trespass to property in his presence." *See id.*

The district court rejected Ms. Carlson's proposed verdict form because it interjected irrelevant issues and would confuse the jury. Instead, the district court fashioned a special verdict form that tracked the law of Fourth Amendment excessive force claims. It asked: "Do you find that Plaintiff has proven by a preponderance of evidence that Defendant, Scott Bukovic[,] 'seized' Plaintiff, June Carlson, as that term has been defined in these instructions?"; if the jury answered "yes" to that question: "Do you find that Plaintiff has proven by a preponderance of evidence that Defendant, Scott Bukovic[,] used 'excessive force' against Plaintiff, June Carlson, as that term has been defined in these instructions?" R.185.

The jury answered no to the first question, concluding that no Fourth Amendment seizure had occurred. The district court accepted the verdict. Ms. Carlson did not file a motion for judgment as a matter of law under Federal Rule of Civil Procedure 50.

---

[12] *See also* Tr. at 2-10, 15-16, June 11, 2009.

## II

## DISCUSSION

### A.

### The Section 1983 Fourth Amendment Excessive Force Claim

Ms. Carlson's primary contention is that the district court erred by sending the question of whether there was a seizure to the jury because Officer Bukovic's touching was a seizure as a matter of law and that the seizure was "per se" unreasonable.[13]

---

[13] We do not understand Ms. Carlson's argument to be related solely to the sufficiency of the evidence—an argument that was waived when Ms. Carlson neglected to file a Rule 50 motion at trial. *See Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 401-02 (2006). To the extent Ms. Carlson appeals purely legal issues—she contends that the district court misapprehended the law of Fourth Amendment seizure, erred by granting the motion in limine and erred by rejecting her preferred verdict form—such issues have been preserved for our review. *See Fuesting v. Zimmer, Inc.*, 448 F.3d 936, 940 (7th Cir. 2006) ("[T]he ability of the court of appeals to award a new trial where there is prejudicial evidentiary error is well-established and undisturbed by *Unitherm*."); *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 720 (7th Cir. 2003) ("[I]f the legal question can be separated from the factual one, then we see no bar to reviewing the legal question notwithstanding the party's failure to raise it in a motion for judgment as a matter of law at trial."); *see also Pediatrix Screening, Inc.*

(continued...)

Throughout the district court proceedings, Ms. Carlson maintained that she was "seized as a matter of law" and that the seizure was "per se unreasonable." As her counsel stated at one point: "[E]ven though Defendant opted not to arrest Plaintiff, his initiation and continuation of unconsented-to physical contact against her person, no matter how brief, falls within an exception to the *per se* unreasonable rule only if he had probable cause to arrest her." R.132 at 11. The district court correctly rejected Ms. Carlson's formulations of the law.

Any Fourth Amendment inquiry necessarily begins with a determination of whether a search or seizure actually occurred. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) (beginning a section 1983 Fourth Amendment excessive force inquiry with a determination that a seizure occurred and then turning to whether the force used was unreasonable); *Leaf v. Shelnutt*, 400 F.3d 1070, 1089 (7th Cir. 2005) ("In order to determine whether [an officer] seized [an individual] in violation of the Fourth Amendment, . . . [w]e first consider whether [the individual] was seized . . . ."). *If* that question is answered in the affirmative, the next question is whether the seizure was unreasonable. *See Brower v. County of Inyo*, 489

---

(...continued)

*v. Telechem Intern., Inc.*, 602 F.3d 541, 548 (3d Cir. 2010) ("Given the length and breadth of the District Court's examination of the issues and the opportunities extended to both parties to present their arguments, we are satisfied that [the plaintiff's legal] challenge was fully aired in the District Court and preserved for appellate review.").

U.S. 593, 599 (1989) ("'Seizure' alone is not enough for § 1983 liability; the seizure must be 'unreasonable.'"); *see also Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (distinguishing the seizure inquiry from the reasonableness inquiry); *Leaf*, 400 F.3d at 1089 ("[I]f we conclude that [the individual] was seized, we then must determine whether the seizure was unreasonable."). The seizure and reasonableness inquiries are distinct and should not be conflated. Furthermore, an officer's probable cause to seize is not antecedent to this two-step inquiry but rather is a subset of the larger reasonableness inquiry of the second step.

With respect to the first inquiry—whether there has been a seizure—the traditional approach is whether the person believed he was "free to leave." This standard is an objective one and "is made on the basis of the 'totality of the circumstances' surrounding the encounter." *United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)). For an understanding of this standard, we begin with Justice Stewart's opinion in *United States v. Mendenhall*, 446 U.S. 544 (1980), and the plurality opinion of the Supreme Court in *Florida v. Royer*, 460 U.S. 491 (1983).[14] In *Mendenhall*, Justice Stewart noted that

---

[14] In *Florida v. Royer*, 460 U.S. 491 (1983), Justices Marshall, Powell and Stevens joined an opinion authored by Justice White, adopting the "reasonable person-free to leave" standard enunciated in Justice Stewart's decision in *United States v.*

(continued...)

physical contact with the police was but one of several "circumstances that might indicate a seizure." *See Mendenhall*, 446 U.S. at 554. Additional circumstances include the number and threatening presence of officers, the display of a weapon and the police officers' language and tone of voice suggesting compulsion. *Id.* at 554-55. In *Royer*, the Court determined that a seizure had occurred in an airport when the officers took a man's plane ticket and license, thus preventing him from walking away. *See* 460 U.S. at 504-06. In both cases, the focus was squarely on whether a reasonable person would have felt free to leave.

Later, in *I.N.S. v. Delgado*, 466 U.S. 210 (1984), the Court ruled that immigration "sweeps" in workplaces, whereby government agents asked questions of workers while other agents stood at the doors, did not constitute a Fourth Amendment seizure. The Court explained that "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." *Id.* at 216. Notably, the agents had tapped one of the workers on the shoulder and asked her questions; the Court found that no seizure had occurred. *Id.* at 220. In

---

[14] (...continued)
*Mendenhall*, 446 U.S. 544 (1980). Justice Blackmun joined, in his dissenting opinion, the plurality's adoption of that standard. *See Royer*, 460 U.S. at 514 (Blackmun, J., dissenting).

*Tennessee v. Garner*, 471 U.S. 1, 7 (1985), while holding that "there can be no question that apprehension by the use of deadly force is a seizure," the Court reaffirmed the continued viability of the *Mendenhall* totality of the circumstances approach because, in other circumstances, "it is not always clear just when minimal police interference becomes a seizure."

In cases where physical contact with a citizen occurred, the Court has suggested that the official *purpose* of the contact matters.[15] In *Brower v. County of Inyo*, 489 U.S. 593 (1989), the Court reversed an appellate court determination that a police roadblock that caused a fatal car crash was not a seizure. The Supreme Court determined that the roadblock was indeed a seizure because the roadblock effectively *controlled* and *stopped* the suspect. The Court explained,

> Violation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be will-

---

[15] The purpose of an encounter must not be confused with an officer's subjective intent when engaging the encountered individual. The reasonable person-free to leave standard is an objective one, and both the officer's and the encountered individual's subjective beliefs during the encounter are not determinative as to whether a seizure occurred. *See* 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.4(a), pp. 413-14 (4th ed. 2010).

ful. . . . In sum, the Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful government conduct.

      . . . .

      . . . It is clear, in other words, that a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent passerby), nor even whenever there is a governmentally caused and governmentally *desired* termination of an individual's freedom of movement (the fleeing felon), but only when there is a governmental termination of freedom of movement *through means intentionally applied*.

*Brower*, 489 U.S. at 596-97 (internal citations and quotation marks omitted) (emphasis in original); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998) (concluding that no seizure occurred where the police accidentally struck and killed a motorcyclist during a high-speed pursuit). The Court expanded on that rationale in *California v. Hodari D.*, 499 U.S. 621, 624-29 (1991), where the Court determined that no seizure occurred when a suspect was approached by police, then ran away and was chased. The Court stated that "[t]he word 'seizure' readily bears the meaning of laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *Id.* at 626. The Court cited with approval commentary that explained that an arrest could be accomplished by "'constructive detention,'" which "'is accomplished by merely touching,

however slightly, the body of the accused, by the party making the arrest *and for that purpose.'* " *Id.* at 625 (citing A. Cornelius, Search and Seizure 163-64 (2d ed. 1930)) (emphasis added). Finally, an important caveat to the free to leave standard, often employed in bus sweep contexts, is that "when a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' " *Brendlin v. Cal.*, 551 U.S. 249, 255 (2007) (quoting *Bostick*, 501 U.S. at 435-36).

As this discussion makes clear, mere physical contact by an officer, although a significant factor, does not *automatically* qualify an encounter as a Fourth Amendment seizure. *See* 4 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.4(a), p. 427 (4th ed. 2010) ("Even physical contact is acceptable if it is consensual, a normal means of attracting a person's attention or obviously serves some nonseizure purpose." (internal quotation marks and citations omitted)); *see also id.* at n.85 & accompanying text (commenting that "physically grabbing and moving the suspect," with a concomitant show of force and authority, may indicate that a seizure occurred). For instance, we have suggested that physical contact does not elevate automatically an encounter to the level of a Fourth Amendment seizure. As we said in *Acevedo v. Canterbury*, 457 F.3d 721, 725 (7th Cir. 2006), "[c]ertain types of non-restraining physical contact, without a concomitant showing of authority, are just too minor to constitute a

'seizure' for Fourth Amendment purposes without doing violence to that word." *See also Williams v. City of Champaign*, 524 F.3d 826, 829 (7th Cir. 2008) ("In constitutional tort cases (including cases brought to vindicate rights created by the Fourth Amendment) as elsewhere in the law, *de minimis non curat lex*."); *Leaf*, 400 F.3d at 1090-91 (determining that no seizure occurred where officers pointed guns and shined lights towards a sleeping man, even if they nudged him). In sum, there are, of course, situations in which the totality of the circumstances require a determination that a seizure has occurred as a matter of law. *See, e.g., Tenn. v. Garner*, 471 U.S. 1, 7 (1985) (fatal shooting of suspect constituted seizure). However, it is also clear that a mere touch is not *per se* a seizure under the Fourth Amendment.

The application of these principles to this case centers on the question of whether a seizure took place. In this case, this question admittedly is one of some difficulty. We conclude, accordingly, that the district court correctly submitted the matter to the jury. Even accepting the evidence in the light most favorable to Officer Bukovic, we cannot characterize the situation as the sort of de minimis touching that, as a matter of law, has no Fourth Amendment implications. There certainly was evidence of record that would have permitted the jury to determine that a seizure in fact did take place. On the other hand, the jury also was entitled to reach the opposite conclusion: Officer Bukovic's contact with Ms. Carlson's arm may have been so light and so momentary that it did not convey, to the objective observer, a demonstration of anything more than an encourage-

ment that she leave the area. We must remember that police officers find themselves in a myriad of contentious, and potentially explosive, situations where in an effort to defuse the situation, a combination of verbal declarations and gestures must be employed. When considered in context, such actions may be more exhortatory than commanding in nature. While it could have determined otherwise, we believe that the jury was entitled to determine that, at the time he touched Ms. Carlson's arm, Officer Bukovic's action was just this type of gesture: more exhortatory than commanding. The appropriate characterization of this situation was a question for the jury after it had heard all the evidence. *Cf. Acevedo*, 457 F.3d at 725 (concluding that the question of whether an officer seized an individual by punching him in the face was a question for the jury).

The district court's formulation of jury instructions adequately articulated these legal principles.[16] The

---

[16] Ms. Carlson does not dispute that the jury was competent to serve as the factfinder on the issue of whether a Fourth Amendment seizure had occurred. Indeed, that proposition is well established. *See, e.g.*, *Acevedo v. Canterbury*, 457 F.3d 721, 725 (7th Cir. 2006) ("Based on this testimony, a reasonable jury could have found that Acevedo was seized by Canterbury's blow to his head."); *Driebel v. City of Milwaukee*, 298 F.3d 622, 638 (7th Cir. 2002) (commenting that "a rational jury might very well conclude that Officer Sgrignuoli . . . was seized by the detectives who accosted him," but assuming that seizure had occurred); *see also Gardenhire v. Schubert*, 205 F.3d 303, 313-15

(continued...)

district court informed the jury that the seizure determination depended on whether Ms. Carlson's liberty was restrained and whether "a reasonable person would not have felt free to ignore the presence of law enforcement and to go about her business." Trial Tr. at 568. The jury was instructed to evaluate objectively the totality of the circumstances. The district court provided, moreover, appropriate factors to guide the jury's consideration of the issue. Ms. Carlson was not entitled to an instruction that made the determination depend entirely on whether physical contact had occurred; that factor is but one that the jury ought to consider. *See Mendenhall*, 446 U.S. at 554.[17] Nor was Ms. Carlson entitled to an instruction linking the seizure inquiry to the issue of probable cause because those concepts are not to be conflated. The district court did not abuse its discretion in rejecting Ms. Carlson's proposed jury instructions.

The district court also acted well within its discretion when it declined to give a jury instruction describing the Illinois criminal trespass statute and when it precluded Ms. Carlson from presenting evidence

---

[16] (...continued)
(6th Cir. 2000); *Hawkins v. City of Farmington*, 189 F.3d 695, 702 (8th Cir. 1999); *Cassady v. Tackett*, 938 F.2d 693, 697-98 (6th Cir. 1991).

[17] *See also* 4 Martin A. Schwartz & George C. Pratt, Section 1983 Litigation § 8.01 (2d ed. 2009) (Instruction 8.01.7).

to show that she had not violated the statute.[18] Whether the statute was violated was not relevant to the threshold issue of whether a seizure had occurred. Determining whether a seizure occurred needed to be decided separate and apart from the question of reasonableness.[19]

---

[18] We review a rejected jury instruction in comparison to the actual charge issued by the district court. *See Ammons-Lewis v. Metro. Water Reclamation Dist. of Greater Chi.*, 488 F.3d 739, 751 (7th Cir. 2007). We review Rule 403 rulings for abuse of discretion. *See Estate of Moreland v. Dieter*, 395 F.3d 747, 754-55 (7th Cir. 2005).

[19] Additionally, the trespass issue had very little relevance to whether Officer Bukovic used excessive force in committing the alleged seizure. The doctrine of Fourth Amendment reasonableness has distinct, component parts. A seizure without probable cause is conceptually different from a seizure that employs excessive force; both are unreasonable, but for different reasons. *See Evans v. Poskon*, 603 F.3d 362, 364 (7th Cir. 2010) (distinguishing between Fourth Amendment unreasonableness based on lack of probable cause and excessive force in the exclusionary rule context); *McKenna v. City of Phila.*, 582 F.3d 447, 460 (3d Cir. 2009) ("The District Court properly rejected Timothy McKenna's argument that it should have instructed the jury, which rejected plaintiffs' excessive force claims, that any amount of force used to effect an arrest without probable cause is *per se* excessive. [That] statement of the law is unsupported by citation, and, moreover, is wrong. As the Court correctly concluded, the jury was required to review any excessive force claims under a totality of the cir-

(continued...)

---

[19] (...continued)

cumstances test, as enunciated in *Graham v. Connor*, 490 U.S. 386 (1989), to determine whether the force used was reasonable." (parallel citations omitted)); *Snell v. City of York, Pa.*, 564 F.3d 659, 672-73 (3d Cir. 2009) (rejecting "efforts to bootstrap excessive force claims and probable cause challenges"); *Cortez v. McCauley*, 478 F.3d 1108, 1127 (10th Cir. 2007) (distinguishing between Fourth Amendment excessive force and false arrest claims); *Papineau v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2006) ("[T]he reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest."); *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004) ("Because the excessive force and false arrest factual inquiries are distinct, establishing a lack of probable cause to make an arrest does not establish an excessive force claim, and vice-versa.").

Of course, we have recognized false arrest as a valid basis for a section 1983 Fourth Amendment claim. *See Bentz v. City of Kendallville*, 577 F.3d 776, 779 (7th Cir. 2009) ("Where an arrest occurs without probable cause, the plaintiff may bring a claim for unreasonable seizure."). Such a claim necessarily focuses the reasonableness metric on the existence of an officer's probable cause to detain. *See, e.g., Belcher v. Norton*, 497 F.3d 742, 748 (7th Cir. 2007). Often times, Fourth Amendment excessive force and false arrest claims are asserted in the same action. *See, e.g., Catlin v. City of Wheaton*, 574 F.3d 361, 364-65 (7th Cir. 2009); *Williams v. City of Champaign*, 524 F.3d 826, 827 (7th Cir. 2008); *Tibbs v. City of Chi.*, 469 F.3d 661, 662 (7th Cir. 2006); *Morfin v. City of E. Chi.*, 349 F.3d 989, 994-96 (7th Cir. 2003). In this case, however,

(continued...)

For the same reasons, the district court acted well within its discretion in declining to approve a verdict form submitted by Ms. Carlson. It simply did not comport accurately with the governing legal principles.[20]

### B.

### The Section 1983 *Monell* Claim

Ms. Carlson also appeals the district court's dismissal of her *Monell* failure-to-train claim asserted against the City. However, because Ms. Carlson's section 1983 Fourth Amendment excessive force claim failed, her *Monell* claim failed as well. *See Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) ("[T]here can be no liability under *Monell* for failure to train when there has been no violation of the plaintiff's constitutional rights."); *Windle v. City of Marion, Ind.*, 321 F.3d 658, 663 (7th Cir. 2003) ("[A] plaintiff must prove that the individual officers are liable on the underlying substantive claim in order to recover damages from a municipality under [a theory of] . . . failure to train."). Accordingly, we affirm

---

[19] (...continued)

Ms. Carlson did not advance a false arrest claim. In fact, she affirmatively disavowed any intention to assert a false arrest claim. *See* Appellant's Br. 22; Tr. at 20, May 18, 2009; Tr. at 4-6, June 5, 2009.

[20] We review the rejection of a verdict form for abuse of discretion. *See Evans v. City of Chi.*, 513 F.3d 735, 741 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 899 (2009).

the district court's grant of summary judgment in favor of the City on the *Monell* claim.

## C.

### The District Court's Alleged Bias

Ms. Carlson contends that the district court was biased because it showed sympathy for Officer Bukovic when it referred to him as "this poor cop" during a pretrial conference. *See* Appellant's Br. 45-47. Ms. Carlson does not specifically request a form of relief under this theory, but we assume she demands a new trial with a different presiding judge. Ms. Carlson, however, did not move for the district court's disqualification under 28 U.S.C. § 455. Although we have left open the question of "whether we may review a refusal to recuse under section 455(b) when the argument is raised for the first time on appeal," *United States v. Smith*, 210 F.3d 760, 764 (7th Cir. 2000), we need not resolve that issue today because recusal was unnecessary in this case.[21] The district court's off-the-cuff remark did not "display a deep-seated favoritism or antagonism that would make fair judgment impossible." *In re Huntington Commons Assocs.*, 21 F.3d 157, 158 (7th Cir. 1994) (internal quotation marks omitted); *see also Hook v. McDade*, 89 F.3d 350, 354-56

---

[21] "[T]he denial of a request that the judge recuse himself under section 455(a) must be appealed immediately by application for writ of mandamus, or it is waived." *United States v. Horton*, 98 F.3d 313, 316 (7th Cir. 1996).

(7th Cir. 1996) (describing the various forms of and bases for § 455 recusal). Our review of the entire record has assured us that the district court managed Ms. Carlson's case competently and fairly.

Ms. Carlson also appears to contend that the district court was biased and should have been removed pursuant to 28 U.S.C. § 144. However, Ms. Carlson concedes that she did not comply with the "procedural and substantive requirements" of § 144. *See United States v. Barnes*, 909 F.2d 1059, 1072 (7th Cir. 1990).

## Conclusion

For the reasons stated in this opinion, we affirm the judgment of the district court.

AFFIRMED